**FILED**

**SEP - 8 2006**

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

**ENTERED**

**SEP - 8 2006**

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY_____ Deputy Clerk

1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   10250 Constellation Blvd., Suite 1700
3  Los Angeles, California 90067
   Telephone: (310) 229-1234
4  Facsimile: (310) 229-1244
   Attorneys for Franchise Pictures LLC, et al.
5
6  STUART I. KOENIG (SBN 102764)
   CREIM, MACIAS, KOENIG & FREY LLP
   633 West Fifth Street, 51st Floor
7  Los Angeles, California 90071
   Telephone:  (213) 614-1944
8  Facsimile:  (213) 615-1961
   Attorneys for SPE Holding Corp., et al.

9

## UNITED STATES BANKRUPTCY COURT

10

## CENTRAL DISTRICT OF CALIFORNIA

11

### SAN FERNANDO VALLEY DIVISION

12

| | |
|---|---|
| 13  In re | ) Case No. SV 05-13855-MT |
| 14  FRANCHISE PICTURES LLC, et al. | ) Chapter 11<br>) (Jointly Administered |
| 15              Debtors. | ) |
| 16  ☒   Affects All Debtors<br>    ☐   Affects Only: | ) |
| 17  In re<br>    SPE HOLDING CORP., et al., | ) Case No. SV 05-50077-MT |
| 18              Debtors | ) Chapter 11<br>) (Jointly Administered) |
| 19 | ) **FINDINGS OF FACT AND** |
| 20 | ) **CONCLUSIONS OF LAW RE MOTION** |
| 21  ☒   Affects All Debtors<br>    ☐   Affects Only: | ) **TO APPROVE: (1) SALE OF ASSETS**<br>) **FREE AND CLEAR OF LIENS AND** |
| 22 | ) **INTERESTS; (2) ASSUMPTION AND**<br>) **ASSIGNMENT OF DESIGNATED** |
| 23 | ) **EXECUTORY CONTRACTS; AND (3)**<br>) **REJECTION OF DESIGNATED** |
| 24 | ) **EXECUTORY CONTRACTS** |
| 25 | ) Date:      September 5, 2006 |
| 26 | ) Time:      9:30 a.m.<br>) Place:    Courtroom "302" |
| 27 | )            21041 Burbank Blvd.<br>)            Woodland Hills, CA |
| 28 | |

1

Hearings were held on August 11, August 23 and September 5, 2006 before the Honorable Maureen A. Tighe, United States Bankruptcy Judge for the Central District of California, in Courtroom "302" located at 21041 Burbank Blvd., Woodland Hills, California, for the Court to consider the "Motion To Approve: (1) Sale Of Assets Free And Clear Of Liens And Interests; (2) Assumption And Assignment Of Designated Executory Contracts; And (3) Rejection Of Designated Executory Contracts" (the "Sale Motion") filed by Franchise Pictures LLC, Franchise Pictures, Inc., Franchise Films LLC, Franchise Entertainment LLC, 3000 Miles Productions, Inc., Alex and Emma Productions, Inc., Auggie Rose Productions, Inc., Battlefield Productions, LLC, Carter Productions, LLC, Champs Productions Inc., Conprod, Inc., Heightened Productions Inc., Nine Yards Productions, LLC, Phoenician Entertainment LLC, Pledge Productions, Inc., Rangers Productions, Inc., Seraph Productions, Inc., Split Card Films, Inc., Suite Productions LLC, Valentine Productions, Inc., VLN Productions, Inc., TGD Productions, Inc., Phoenician Entertainment, Inc., Nordhoff Rentals, Inc., Franchise Classics Pictures, Inc., Franchise Creative Corp. and Franchise Television LLC, as debtors and debtors in possession (collectively, the "Franchise Debtors"), jointly administered under Case No. SV 05-13855-MT, and Animal Productions, LLC, Captured Productions, Inc., Cinema Holdings, Inc., Desperate, Inc., Disorder Productions, Inc., Lost Angels Distributions,

1  Inc., Merciless Movies, Inc., Nine Yards Two Productions, Inc.,

2  Rabbitprod, Inc., Restrained Films, Inc., Ripped Films, Inc.,

3  Rumbling Productions, Inc., Saint Mortimer Films, Inc.,

4  Seabreeze Productions, Inc., Sever Productions, Inc., Silent

5  Productions, Inc., Snake Eyes Productions, Inc., South Boondock

6  Productions, Inc., Spartan Distribution, Inc., SPE Holding

7  Corp., Stormy Productions, Inc., Twin Pictures Acquisition

8

9  Corp., Unbelievable Productions, Inc., VS Productions, Inc., Zig

10 Zag Productions, Inc. and Franchise Studios LLC, as debtors and

11 debtors in possession (collectively, the "SPE Debtors," and,

12 together with the Franchise Debtors, the "Debtors"), jointly

13 administered under Chapter 11 Case No. SV 05-50077-MT, pursuant

14 to which the Debtors requested an order (1) approving the sale

15 of substantially all of the Debtors' assets to FPLAC LLC

16

17 ("FPLAC") or a successful overbidder in accordance with the

18 terms of that certain Asset Purchase Agreement executed by the

19 parties on or about April 28, 2006 (the "APA") or such other

20 agreement for the sale of substantially all of the Debtors'

21 assets that may be approved by the Court; (2) authorizing the

22 assumption by the Debtors and assignment of certain executory

23 contracts as identified in Schedule 6.1 to the APA, as such

24 Schedule may have been subsequently amended and attached to the

25 Joint APA (as defined herein) (the "Assumed Contracts"); (3)

26 authorizing the rejection by the Sellers of certain executory

27 contracts as identified in Schedule 6.2 to the APA, as such

28

3

1  Schedule may have been subsequently amended and attached to the

2  Joint APA (the "Rejected Contracts"); and (4) approving, in the

3  case of an alternate bidder tendering a higher and better offer

4  than FPLAC, the sale of such assets to an alternate bidder

5  pursuant to the terms and conditions of the approved bidding

6  procedures.   Appearances were as noted in the record of the

7  August 11, August 23, and September 5, 2006 hearings.

8  

9      The Court, having considered the Sale Motion, the

10 accompanying Memorandum of Points and Authorities and evidence

11 filed by the Debtors, the oppositions to the Sale Motion (each,

12 an "Opposition," and collectively, the "Oppositions") filed by

13 ApolloProMedia, CB Productions, Inc., et al., Comerica Bank, La

14 Financiere Des Enterprises Culturelles, The Film Musicians

15 Secondary Markets Fund (the "Musicians Fund"), Intertainment

16 Licensing GmbH, The Kushner-Locke Company, MHF Zweite Academy

17 Film GmbH & CO., KG, et al., Morgan Creek Productions, Inc.

18 ("MCP") (including MCP's Motion to Compel Assumption of

19 Executory Contracts), New City Releasing, Programs 4 Media Ltd.,

20 Proteus Films Inc., et al., Elie Samaha ("Samaha"), Sony

21 Pictures Home Entertainment Inc., Ultra Distributors Pvt. Ltd.,

22 and Warner Bros., the Statement filed by the Writers Guild of

23 America west, Inc., for itself and its affiliate Writers Guild

24 of America East, Inc, the Screen Actors Guild, Inc., the

25 Directors Guild of America, Inc., and their respective pension

26 

27 

28 and health plans, the replies to the Oppositions and other

4

1  pleadings with respect to the Sale Motion filed by the Franchise

2  Debtors, the SPE Debtors, FPLAC and the Committee (as defined

3  below) in further support of the Sale Motion, and upon

4  consideration of the Joint APA and the Debtors' analysis of the

5  bids received, and upon consideration of the oral arguments and

6

7  statements of counsel made at the hearings on the Sale Motion,

8  and the testimony of Hans Turner and David Bergstein at the

9  August 23, 2006 hearing, and the proffers of testimony at the

10 September 5, 2006 hearing, and proper notice of the Sale Motion,

11 the APA, the Schedules to the APA, the subsequent amendments to

12 the Schedules and Exhibits to the APA filed on August 10, 2006,

13 August 11, 2006, August 22, 2006, August 24, 2006, August 31,

14

15 2006 and September 1, 2006, the Joint APA, and the hearings on

16 the Sale Motion having been provided, and good cause appearing

17 therefor, the Court hereby finds and concludes as follows:

18                        Findings of Fact

19     1.   Franchise Pictures LLC, Franchise Pictures, Inc.,

20 Franchise Films LLC, Franchise Entertainment LLC, 3000 Miles

21 Productions, Inc., Alex and Emma Productions, Inc., Auggie Rose

22 Productions, Inc., Battlefield Productions, LLC, Carter

23 Productions, LLC, Champs Productions Inc., Conprod, Inc.,

24 Heightened Productions Inc., Nine Yards Productions, LLC,

25

26 Phoenician Entertainment LLC, Pledge Productions, Inc., Rangers

27 Productions, Inc., Seraph Productions, Inc., Split Card Films,

28 Inc., Suite Productions LLC, Valentine Productions, Inc., VLN

Productions, Inc., and TGD Productions, Inc. (collectively, the "Original Debtors") commenced their chapter 11 bankruptcy cases by filing voluntary petitions under chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in August, 2004. With the exception of TGD Productions, Inc., which filed its voluntary petition on August 23, 2004, the Original Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code on August 18, 2004. The Original Debtors are managing their financial affairs as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2. On September 15, 2004, the Court entered an order approving the joint administration of the Original Debtors' bankruptcy cases under the lead case of Franchise Pictures LLC (case number SV 05-13855-MT).

3. Subsequently, on March 11, 2005, Phoenician Entertainment, Inc., Nordhoff Rentals, Inc., Franchise Classics Pictures, Inc., Franchise Creative Corp. and Franchise Television LLC (collectively, the "New Debtors," and, with the Original Debtors, defined above as the "Franchise Debtors") commenced their chapter 11 bankruptcy cases by filing voluntary petitions under chapter 11 of the Bankruptcy Code. The New Debtors are all wholly-owned subsidiaries of Franchise Pictures LLC. No trustee has been appointed in the New Debtors' cases, and the New Debtors continue to manage their financial affairs as debtors in possession under Sections 1107 and 1108 of the

1   Bankruptcy Code.   A committee was appointed in the Franchise

2   Debtors' cases on September 10, 2004 (the "Committee").

3       4.   On or about November 21, 2005, the SPE Debtors (other

4   than Franchise Studios LLC) commenced bankruptcy cases by filing

5   voluntary petitions for relief under Chapter 11 of the

6   Bankruptcy Code.   On December 1, 2005, Franchise Studios LLC

7   commenced its bankruptcy case by filing a voluntary petition for

8   relief under Chapter 11 of the Bankruptcy Code.   As set forth

9   more fully below, R2D2, LLC has the authority to exercise

10  control over 100% of the voting rights over the SPE Debtors, and

11  Hans Turner, the Chief Financial Officer of the SPE Debtors and

12  the individual who signed the SPE Debtors' voluntary petitions,

13  was duly authorized and empowered to execute and file the

14  petitions for the SPE Debtors and administer the SPE Debtors'

15  cases and to act in his corporate capacity on behalf of the SPE

16  Debtors, and there was no violation of any principles of

17  corporate governance in connection with such actions.   The

18  current sale is consistent with the control exercised by the

19  properly elected officers and directors of the SPE Debtors.   No

20  trustee has been appointed and the SPE Debtors continue to

21  manage their financial affairs as debtors in possession under

22  Sections 1107 and 1108 of the Bankruptcy Code.

23      5.   The corporate records filed with the court indicate

24  Hans Turner has been the sole director of the SPE debtors since

25  December 3, 2004, when Samaha was removed as director.

1  Therefore, facially, the SPE debtors' cases were properly filed

2  by Turner as the SPE debtors' sole director. Corporate

3  resolutions, dated November 15, 2005, authorizing the SPE

4  debtors to file bankruptcy were filed in each of their

5  respective cases. Samaha seeks to peel the onion back a further

6  layer by questioning the installment of Turner as director. He

7  does so by questioning Turner's authority in signing April 1,

8  2004 Amendment to the Stock Pledge Agreement, which gave R2D2,

9  LLC "the right to exercise voting rights." Turner signed on

10  behalf of both Franchise Pictures, LLC and SPE Holding Corp. It

11  appears from the corporate records that, at the time, Turner was

12  the executive vice president of both entities, and had authority

13  to enter agreements on behalf of the entities as an officer.

14  *See* Stock Pledge Agreement of February 4, 2004, page 3.

15  Samaha's knowledge and acquiescence of Turner's authority to

16  enter into agreements is evidenced by the signature bars to the

17  Assignment of December 9, 2002, which Samaha signed on behalf of

18  himself and Turner signed on behalf of SPE Holding Corp.

19  Whereas Samaha would have the court evaluate the Amendment to

20  the Stock Pledge Agreement in a vacuum, it seems more

21  appropriate to assess it in conjunction with the Convertible

22  Promissory Note, the Letter of Intent, and the Assignment of

23  December 9, 2002, all signed by Samaha. These documents contain

24  stock pledge provisions and other related provisions. Paragraph

25  3(f) of the Letter of Intent, which is declared to be binding,

states that "[c]ontemporaneous with the execution of this LOI, Samaha and Stevens will provide documents evidencing transfer to Franchise [or an SPE holding company] of any and all stock or equity ownership that they may hold in the SPE's as referred to in paragraph 2(b) and listed in Exhibit A." More significantly, the Assignment of December 9, 2002 provides that "Samaha does hereby, severally, assign, transfer, and convey unto [SPE] Holding Corp., and [SPE] Holding Corp. does hereby accept, all of Samaha's shares of the Common Stock of each of the SPE Corporations and all of his membership interests in each of the SPE Limited Liability Companies standing in his name on the books of the applicable SPE." Based on the above, it can be concluded that SPE Holding Corp. had authority over Samaha's equity interests in the SPE debtors and therefore acted within its authority in signing the Amendment to the Stock Pledge Agreement. In short, based upon the corporate records provided so far, the court does not have any reason to believe that the filing of the SPE debtors' cases was unauthorized.

6.    The Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. Sections 157(b) and 1334. This is a "core" proceeding within the meaning of 28 U.S.C. Section 157(b)(2). The statutory predicates for the relief requested in the Sale Motion include sections 105(a), 363, 365 and 1146(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014.

7.   Actual written notice of the Sale Motion, the APA, the Schedules to the APA, the subsequent amendments to the Schedules and Exhibits to the APA filed on August 10, 2006, August 11, 2006, August 22, 2006, August 24, 2006, August 31, 2006 and September 1, 2006, the Overbid Procedures (as defined below), the hearings on the Sale Motion, and the Sale (as defined below) (including, without limitation, the terms and conditions of the Joint APA), and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been afforded to all interested persons and entities.   Prospective bidders for the Debtors' assets were given more than adequate opportunity to tender an overbid for the assets to be sold, and any party or parties affected by the amendments to the Schedules and/or Exhibits to the APA or the Joint APA had an adequate opportunity to assert objections to the proposed Sale based upon such amendments.

8.   As evidenced by the proofs of service filed with this Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the APA, the Schedules to the APA, the subsequent amendments to the Schedules and Exhibits to the APA filed on August 10, 2006, August 11, 2006, August 22, 2006, August 24, 2006, August 31, 2006 and September 1, 2006, the Overbid Procedures, the hearings on the Sale Motion, and the Sale (including, without limitation, the terms and conditions of the Joint APA), has been provided in accordance with sections

102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014 and any applicable Local Bankruptcy Rules. The Debtors also have complied with all obligations to provide notice of the Sale Motion, the Overbid Procedures, the hearings on the Sale, and the Sale required by the order approving the Overbid Procedures (the "Procedures Order"). Under the circumstances, the foregoing notice was good, proper, sufficient and appropriate, no other or further notice of the Sale Motion, the Overbid Procedures, or the hearings on the Sale is required, and the notice requirements of all applicable Rules of the Federal Rule of Bankruptcy Procedure and the Local Bankruptcy Rules of the Central District of California have been satisfied.

9.    The principal provisions of the APA were summarized in the Sale Motion.   In May 2006, the Debtors forwarded "teaser" presentations regarding the Sale to over 80 parties that had either expressed interest in the Debtors' assets, or, in the Debtors' business judgment, were the parties most likely to tender a bid for their assets.   In addition, all creditors and parties in interest were provided a copy of the APA for review prior to the hearings on the Sale Motion.   Further, the Debtors advertised the proposed Sale in national publications designed to reach those parties most likely to have tendered an overbid for the Debtors' assets.

10.    The Debtors offered extensive materials for review in a due diligence room maintained by counsel for the Franchise

Debtors.   Approximately 15 parties visited the due diligence room, each having either paid a $25,000 deposit or had such requirement waived, and each having executed a confidentiality agreement prior to such visit.

11.   The Debtors promptly served an amended notice of the Sale that had been proposed by the Committee to clarify that alternate bids would be entertained for less than all the Debtors' assets and on different terms and conditions, including price.   The amended notice was served on all parties that had received the "teaser" package previously sent by the Debtors and all of the parties that had responded to the Debtors' print advertising.

12.   The Debtors have demonstrated that it is in the best interests of their estates to proceed with the Sale Motion and the transactions contemplated therein (the "Sale"), and that the decision to proceed with the Sale constitutes an exercise of sound business judgment.

13.   The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

14.   The Committee has conducted substantial independent due diligence and investigation and supports the Sale.   A good business purpose justifies the Sale Motion and the proposed Sale.   Absent a Sale, the administration of the Debtors' cases

1   would be dramatically and adversely affected.   The combined Sale

2   of all of the assets of the Debtors' respective estates in lieu

3   of a piecemeal sale will provide the most benefit to the estates

4   collectively.   Without a sale of substantially all of the

5   Debtors' assets in the fashion contemplated by the Sale Motion,

6   the likelihood of unsecured creditors being paid is extremely

7   slim, and it is unclear whether secured creditors would even be

8   paid in full.   The costs of analyzing and litigating each of the

9   individual production contracts, interlocking distribution

10  agreements, international and domestic licensing rights,

11  residuals and other contract rights between 52 interrelated

12  Debtors and the hundreds of creditors, licensees and other

13  outside parties to these arrangements would quickly consume a

14  good portion of any proceeds obtained in any future sale of any

15  of the Debtors' assets.

16       15.  In consultation with the Committee (as to the

17  Franchise Debtors only) and its counsel, the Debtors negotiated

18  the APA with FPLAC pursuant to which FPLAC agreed to purchase

19  the assets of the Debtors upon the terms and conditions set

20  forth therein, subject to overbids and the approval of the

21  Court.

22       16.  Prior to the hearing on the Sale Motion, the Debtors

23  filed their Motion (the "R2D2 Settlement Motion") Pursuant to

24  Federal Rule of Bankruptcy Procedure 9019 for Order Approving

25  Settlement with R2D2, LLC ("R2D2") and Related Parties

1   (collectively, the "R2D2 Entities").    As set forth in the R2D2

2   Settlement Motion, the Debtors entered into a settlement

3   agreement with the R2D2 Entities pursuant to which the Debtors,

4   conditioned upon a closing of a Sale, agreed, among other

5   things, that, in connection with the purchase of the Debtors'

6   assets by FPLAC, R2D2 would be permitted to credit bid an

7   allowed secured claim of $10,000,000, subject to allocation

8   between the Franchise Debtors and the SPE Debtors.    The

9   remaining claims of the R2D2 Entities were waived.    In the event

10  FPLAC was not the successful bidder, R2D2's allowed secured

11  claim would be $8,000,000, payable exclusively from the cash

12  proceeds, if any, from the sale of the SPE Debtors' assets.    The

13  Court entered its order granting the R2D2 Settlement Motion and

14  approving the parties' settlement on June 5, 2006 (the

15  "Settlement Order").    The Settlement Order is now a final order.

16  17.    Prior to August 18, 2004, Mobius International, Inc.

17  ("Mobius") entered into an Assignment Agreement executed on or

18  about June 7, 2004 with Franchise Pictures LLC ("Franchise") and

19  Franchise Studios LLC ("Studios") and effective as of February

20  1, 2004, and a First Amendment to Assignment Agreement dated as

21  of June 7, 2004 with Franchise and Studios (collectively, the

22  "Assignment Agreement").    Pursuant to the Assignment Agreement,

23  Mobius has been serving as the sales agent on behalf of

24  Franchise and Studios with respect to the motion pictures

25  subject to sales agency agreements with those entities.

18.   On June 5, 2006, following a hearing, the Court approved the overbid procedures (the "Overbid Procedures") proposed by the Debtors and pursuant to which the Debtors solicited bids from other qualified bidders.

19.   On or about August 10, 2006, the Debtors and and Warner Bros. Pictures, a division of Warner Bros. Studio Enterprises Inc. ("WBP") and certain of its affiliates entered into the certain Settlement Agreement dated as of August 10, 2006 (the "WB Settlement Agreement"). A number of the provisions of the WB Settlement Agreement dealt with the treatment in connection with the Debtor's proposed sale transaction of the claims and liens of Warner (as that term is defined in the WB Settlement Agreement). On August 23, 2006, this Court entered its order entitled "Order re Motion Pursuant to Fed. R. Bankr. Pro. 9019 For Order Approving Settlement with Warner Bros. Entities," by which it approved the WB Settlement Agreement. Pursuant to the WB Settlement Agreement, WB withdrew its opposition to the proposed sale.

20.   On or about August 22, 2006, MCP filed with the Court a copy of an agreement between MCP and WBP, dated as of August 21, 2006 (the "WB-MCP Agreement"). A number of the provisions of the WB-MCP Agreement related to the respective rights of the parties if MCP were a successful bidder in connection with a sale of the Debtors' assets.

21.   By on or about August 24, 2006, MCP had delivered to

the Debtors a total of $2,000,000, together with a proposed alternate asset purchase agreement for the acquisition of the Franchise Debtors' assets and a proposed letter of intent (the "MCP LOI") with respect to the acquisition of the assets of the SPE Debtors.   MCP is a "Qualified Bidder" as that term is defined in the APA as to the Franchise Debtors' assets.   The MCP LOI was not accepted by the SPE Debtors and has expired by its own terms.

22.   Thereafter, with the Committee's knowledge and support, the Debtors, FPLAC and MCP engaged in negotiations regarding the terms and conditions upon which FPLAC and MCP would be willing to proceed with a joint bid for the acquisition of the Debtors' assets.   On September 1, 2006, the Debtors, FPLAC and MCP (together, the "Joint Purchasers") entered into an asset purchase agreement (the "Joint APA," a copy of which, as amended, is attached as Exhibit "A" to the Order that accompanies these Findings of Fact and Conclusions of Law)[1] pursuant to which the Joint Purchasers agreed collectively to acquire all of the assets described in the Joint APA, subject to, among other things, an allocation as between themselves of both the Purchased Assets and Assumed Liabilities relating thereto, a waiver by FPLAC of the break-up fee provision of the APA and the Overbid Procedures and repayment of the WB Deposit

---

[1] Any capitalized term not defined herein shall have the meaning ascribed to it in the Joint APA.

1  Focus Advisory to reach its conclusions as to the market value

2  of the Purchased Assets (as described in the Declaration of

3  Philip Fier) appears to be sound.

4      26.  The Joint Purchasers are purchasing substantially all

5  of the assets of the Debtors, and obtaining an assumption and

6  assignment of the Assumed Contracts (as designated in the

7  amended Schedules that accompany the Joint APA) to the extent

8  such contracts are executory contracts within the meaning of 11

9  U.S.C. § 365, in good faith and, as such, the Joint Purchasers

10  are each entitled to the full protections afforded to a good

11  faith purchaser under Section 363(m) of the Bankruptcy Code,

12  having proceeded in good faith in all respects in connection

13  with this proceeding in that, *inter alia*: the Joint Purchasers

14  (a) recognized that the Debtors were free to deal with any other

15  party interested in acquiring substantially all of the assets of

16  the Debtors; (b) complied with the Procedures Order; (c) have

17  disclosed all payments to be made by the Joint Purchasers and

18  other agreements or arrangements entered into by the Joint

19  Purchasers in connection with the Sale; (d) have not violated

20  section 363(n) of the Bankruptcy Code by any action or inaction

21  including but not limited to the negotiation of the Joint APA;

22  and (e) negotiated and executed the Joint APA and any other

23  agreements or instruments related thereto at arms' length and in

24  good faith.  In addition, FPLAC agreed to subject its bid to the

25  competitive bidding procedures set forth in the Procedures

1  are selling the underlying assets of the SPE debtors.

2     29. The transfer of substantially all of the Debtors'

3  assets to the Joint Purchasers in accordance with the terms of

4  the Joint APA will be as of the Closing Date a legal, valid, and

5  effective transfer of such assets, and vests or will vest each

6

7  Joint Purchaser with all applicable right, title, and interest

8  of the Debtors to the applicable Purchased Assets free and clear

9  of all liens accruing, arising or relating to any time prior to

10 the Closing Date, other than those of the Union Entities and

11 Warner.

12    30. The consideration provided by the Joint Purchasers

13 under the Joint APA is fair and adequate and constitutes

14 reasonably equivalent value and fair consideration under the

15 Bankruptcy Code and under the laws of the United States, any

16

17 state, territory, possession or the District of Columbia.

18    31. The allocation of the Purchase Price under the Joint

19 APA between the Debtors is appropriate under the facts and

20 circumstances of these cases. Hans Turner, the Chief Financial

21 Officer of the SPE Debtors, provided detailed testimony

22

23 regarding his analysis of the original allocation of the

24 Purchase Price under the APA, the bases for the analysis, and

25 his conclusion that the proposed allocation of the Purchase

26 Price under the original APA was both fair and reasonable. No

27 party has provided evidence that indicates or even suggests that

28

1   the proposed allocation is unfair. In addition, the

2   apportionment of the Purchase Price between the two groups of

3   Debtors is necessary where the value of the assets is

4   significantly affected by agreements between the two groups of

5   Debtors. The allocation of the Purchase Price under the Joint

6   APA is also appropriate under the circumstances for the same

7   reasons.

8

9       32. There is no distribution of any kind whatsoever to any

10  equity holder, officer or director of the Debtor which is made

11  part of the Sale transaction.

12      33. The Bankruptcy Code provides for a strict priority

13  scheme from which deviation is not permitted. In re Northwest

14  Fin. Express, Inc., 950 F.2d 561 (8th Cir. 1991). Secured

15  creditors should not be deprived of the benefit of their

16  bargain. The absolute priority rule under 11 U.S.C.

17

18  § 1129(b)(2)(B)(ii) prohibits a junior class of creditors from

19  receiving benefits and cash while senior creditors are not being

20  paid in full. Norwest Bank Worthington v. Ahlers, 485 U.S. 197,

21  202 (1988). Here there is no violation of the absolute priority

22  rule because each secured creditor's interest has been protected

23

24  by agreement or other arrangements, and all secured claimants

25  are adequately protected under the Sale.

26      34. Creditors are not being denied any protections that

27  they would have enjoyed if the Sale was being sought as part of

28  a plan of reorganization. The terms of the Joint APA do not

1  necessarily determine the allocation of assets among the

2  creditors of the Debtors' respective estates.

3       35. All of the Oppositions have either been resolved by

4  agreement of the parties or overruled.    To the extent any

5  Oppositions were not overruled prior to the hearings on the Sale

6  Motion, such Oppositions are now overruled.

7

8       36. Pursuant to the Joint APA, the Joint Purchasers may

9  elect to proceed to a Closing upon entry of the Sale Order, and

10 it would be in the best interests of the Debtors' estates for

11 the Sale to close as promptly as possible.  As such, good cause

12 exists to waive any stay provided for under the Federal Rules of

13 Bankruptcy Procedure.

14

15      37. The Joint APA will constitute an Alternate Bid under

16 the APA, and Section 8.2 of the APA shall remain in full force

17 and effect.     FPLAC and the Debtors retain all rights,

18 obligations and defenses arising out of or applicable to Section

19 8.2 of the APA.   The breach of the APA by FPLAC's failing to

20 deliver all of the required deposits in a timely fashion was not

21 material, and the late deposit did not adversely affect the sale

22 process.

23

24      38. Good cause has been shown for the entry of the Sale

25 Order.

26      39. To the extent any Conclusion of Law constitutes a

27 Finding of Fact, it is hereby incorporated by this reference.

28

## Conclusions of Law

1.  This constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

2.  Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

3.  In ruling upon a motion, such as the Sale Motion in these cases, to sell substantially all of a debtor's assets before confirmation of a plan of reorganization, a debtor must show that the proposed sale is (1) supported by a good business reason, and (2) in the best interests of the Debtors' estates. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841-42 (Bankr. C.D. Cal. 1991); In re Naron & Wagner, Chartered, 88 B.R. 85, 87 (Bankr. D. Md. 1988). Courts consider the following factors to determine if the business judgment test has been satisfied: (1) whether a sound business purpose justifies the sale; (2) whether accurate and reasonable notice of the sale was provided; (3) whether the price to be paid is adequate, i.e., fair and reasonable; and (4) whether the sale is in good faith. In re Lionel Corp., supra. In approving any sale outside the ordinary course of business, the Court must not only articulate a sufficient business reason for the sale, it must further find

1   that it is in the best interests of the estate, i.e., that it

2   has been given adequate marketing, that it has been negotiated

3   and proposed in good faith, that the purchaser is proceeding in

4   good faith, and that it is an "arms-length" transaction.   In re

5   Wilde Horse Enterprises, Inc., supra.

6

7         4.   When viewing a sale of assets that involves an

8   insider, the Court should consider whether there is any evidence

9   of fraud or collusion between the purchaser and other bidders,

10  or the debtor, or an attempt to take grossly unfair advantage of

11  other bidders.

12        5.   The Court has evaluated the proposed Sale under the

13  heightened scrutiny standard applicable to a transaction with an

14  "insider" as that term is defined in the Bankruptcy Code.   Under

15  such standard, the Court concludes that the Sale satisfies all

16  of the legal requirements under the Bankruptcy Code and Federal

17

18  Rules of Bankruptcy Procedure.

19        6.   R2D2 has the authority to exercise control over 100%

20  of the voting rights of the SPE Debtors and Hans Turner, the

21  Chief Financial Officer of the SPE Debtors and the individual

22  who signed the SPE Debtors' voluntary petitions, was duly

23  authorized and empowered to execute and file the petitions for

24  the SPE Debtors and administer the SPE Debtors' cases and to act

25

26  in his corporate capacity on behalf of the SPE Debtors, and

27  there was no violation of any principles of corporate governance

28  in connection with such actions.

7.    Samaha's only outstanding objection is that Turner did not have authority to file the SPE debtors' bankruptcy petitions in the first place.    Based on this argument, Samaha appears to insinuate that all actions in these bankruptcy cases are therefore *void ab initio* due to the filings being *ultra vires* acts.    Although Samaha has vocalized this opinion, his failure to bring a motion, particularly in the face of a judicial admonishment to do so, constitutes a waiver of the objection. Motions to dismiss for lack of proper corporate authority or an ultra vires act by a corporate agent are brought under 11 U.S.C. § 1112(b).    <u>In re Gen-Air Plumbing & Remodeling, Inc.</u>, 208 B.R. 426, 430 (Bankr. N.D. Ill. 1997).    Section 1112 clearly requires that a motion to dismiss be heard after notice and a hearing prior to granting relief under that section.    This is especially clear given that the timing of a hearing on the motion is specifically tied to the date the motion is filed.    11 U.S.C. § 1112(b)(3).

8.    Each of the Joint Purchasers has proceeded in good faith within the meaning of Section 363(m) of the Bankruptcy Code, and, as such, each is entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the Sale.

9.    Neither FPLAC, MCP nor any of their respective sucessors or assigns, as a result of any action taken in connection with the Joint APA and the Sale:    (a) is a successor

1   to the Debtors; (b) has, de facto or otherwise, merged with or

2   into the Debtors; or (c) is a continuation or a substantial

3   continuation of the Debtors or any enterprise of the Debtors.

4       10.  The transactions contemplated by the Joint APA are

5   undertaken by the Joint Purchasers without collusion and in good

6   faith, as that term is defined in section 363(m) of the

7   Bankruptcy Code, and accordingly, the reversal or modification

8   on appeal of the authorization provided herein to consummate the

9

10  Sale shall not affect the validity of the Sale, unless such

11  authorization and such Sale are duly stayed pending such appeal.

12      11.  Assumption by the Debtors of all of the Assumed

13  Contracts (to the extent such contracts are executory contracts

14  within the meaning of 11 U.S.C. § 365), and as designated in the

15  ultimate version of the Schedules that accompany the Joint APA)

16  and assignment of such Assumed Contracts, to the extent such

17

18  contracts are executory contracts within the meaning of 11

19  U.S.C. § 365, to the applicable Joint Purchaser in accordance

20  with the provisions of the Joint APA and the Schedules thereto

21  is in the best interests of the estates and is in furtherance of

22  the purpose of the Joint APA.

23

24      12.  There are no monetary cures required to be paid or

25  monetary defaults to be cured with respect to the assumption of

26  any of the Assumed Contracts and any requirements under 11

27  U.S.C. § 365(b)(1)(A) have been satisfied.  The Joint Purchasers

28  have demonstrated adequate assurance of future performance (as

required by 11 U.S.C. § 365) with respect to their respective Assumed Contracts.

13. Rejection of all of the Rejected Contracts (as designated in the ultimate version of the Schedules that accompany the Joint APA) as set forth in the Joint APA is in the best interests of the estates and is in furtherance of the purpose of the Joint APA.

14. Where any party to a Rejected Contract (to the extent that such contract is an executory contract) has filed with the Court an express notification of its intent to preserve its rights under Section 365(n) with respect to any such Rejected Contract, such reservation of rights is appropriate under the circumstances. In the absence of a notice from any party to a Rejected Contract affirmatively exercising its rights under Section 365(n) of the Bankruptcy Code, all Rejected Contracts are hereby terminated. The only parties that have elected to retain their rights pursuant to Section 365(n) under Rejected Contracts are Splendid Kilm Klein GmbH, Spartan Home Entertainment LLC, Argo Home Entertainment, LLC, Saturn Home Entertainment, LLC, Newmarket Capital Group, Fintage Magyar Kft. and Magyar Szellemi Tulajdont Kezelo Kft.

15. Except as provided (i) in the WB Settlement Agreement with respect to the liens, mortgages, security interests, and certain other rights and interests of Warner and (ii) in the Joint APA with regard to the liens and obligations of the Union

1   Entities, the Debtors may sell the Purchased Assets free and

2   clear of all liens, claims, encumbrances and interests against

3   the Debtors or their estates because, in each case, one or more

4   of the standards set forth in section 363(f)(1)-(5) of the

5   Bankruptcy Code has been satisfied. Except as to any liabilities

6

7   that have been expressly assumed by the Joint Purchasers under

8   the Joint APA, including, without limitation, any obligations of

9   the Joint Purchasers to the Union Entities and the continuation

10  of Pre-Closing Guild Liens as defined and provided for in the

11  Joint APA, pursuant to Section 363(f) of the Bankruptcy Code,

12  and the obligations to Warner under the Warner/Franchise

13  Agreements, all assets sold by the Debtors by way of the Joint

14  APA may be sold free and clear of any and all liens, claims,

15  encumbrances and interests, with such liens, claims,

16

17  encumbrances and interests to attach to the cash proceeds of the

18  Sale payable to the Debtors under the Joint APA in the same

19  order, priority and validity as the prepetition liens, claims,

20  encumbrances and interests with respect to the Purchased Assets,

21  or as may have been agreed to, in writing with the Debtors, by

22

23  any party holding any such lien, claim, encumbrance or interest.

24  Other than the Guilds and Warner, as provided in the Joint APA

25  and in the WB Settlement Agreement, those holders of liens

26  against the Debtors or their estates who did not object, or who

27  withdrew their objections, to the Sale or the Sale Motion are

28  deemed to have consented to the Sale free and clear of liens,

claims, encumbrances and interests pursuant to section 363(f)(2) of the Bankruptcy Code, and those liens, claims, encumbrances and interests shall attach to the proceeds of the Sale in the same order, validity and priority as they did with respect to the Purchased Assets prior to the Sale, or as may have otherwise been agreed to in writing with the Debtors.

16.   The Sale is a prerequisite to the Debtors' ability to confirm and consummate a chapter 11 plan or plans, and is made in contemplation of such a plan or plans.  Accordingly, the sale is a transfer pursuant to section 1146(a) of the Bankruptcy Code, which shall not be taxed under any law imposing a stamp tax or similar tax.

17.   A proposed sale of substantially all of a debtor's assets pursuant to 11 U.S.C. § 363 cannot be approved when the sale will necessarily dictate the terms of a plan of reorganization, thereby denying creditors the procedural protections of the plan process.   See, e.g., In re Braniff Airways, Inc., 700 F.2d 935, 939-940 (5th Cir. 1983); In re Lionel Corp., supra.  A proposed transaction is more likely to be deemed to be a "sub rosa" plan to the extent it (i) dictates the terms of any future reorganization plan; (ii) disenfranchises creditor voting in the plan process; (iii) alters creditors' rights; (iv) disposes of highly significant assets; and (v) releases claims against the debtor.  "Where a sale results in disparate treatment of similarly situated

1   creditors the sale may appear to be at the expense of individual

2   creditor constituencies.   However, if the sale is in the best

3   interests of the estate it follows that the entire estate

4   suffers in the absence of the sale.   In other words, a sale

5
    under § 363(b) is intended to benefit the estate by minimizing
6
7   loss of value to the estate.   There is nothing in the statute

8   that requires a § 363(b) sale to provide a pro rata distribution

9   to all unsecured creditors or even any distribution to all

10  unsecured creditors."   Trans World Airlines, Inc., et al., 2001

11  WL 1820326, at 11-12 (Bankr. D. Del. 2001).

12
         18.   The Sale is not a "sub rosa" plan of reorganization.
13
    When an objector claims that it is being denied certain
14
15  protections because approval for a sale is sought under 11

16  U.S.C. § 363 instead of as part of a plan of reorganization, the

17  objector must specify exactly what protection it is being

18  deprived of.   In re Continental Air Lines, 780 F.2d 1223, 1228

19  (5th Cir. 1986).   Here, there are no creditors whose rights or

20  protections are being denied in a way not otherwise permitted by

21  the Bankruptcy Code.
22
         19.   Pursuant to section 363(b) of the Bankruptcy Code,
23
24  each of the Debtors, as well as their respective officers,

25  employees, and agents, are authorized and empowered to take any

26  and all actions necessary or appropriate to (i) consummate the

27  Sale of the Purchased Assets to the applicable Joint Purchaser

28  pursuant to and in accordance with the terms and conditions of

the Joint APA, (ii) close the Sale as contemplated in the Joint APA and this Sale Order, and (iii) execute and deliver, perform under, consummate, implement and close fully the Joint APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Joint APA and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Joint APA and such other ancillary documents.  Any actions taken by the Debtors necessary or desirable to consummate such transactions prior to the entry of the accompanying Order should be ratified under the circumstances.

20.  No consents or approvals, other than the approval of this Court, are required for the Debtors to consummate the Sale.

21.  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly determines that there is no just reason for delay in the implementation of the accompanying Order, and expressly directs entry thereof.

22.  To the extent any Finding of Fact constitutes a Conclusion of Law, it is hereby incorporated by this reference.

Dated: September  8 , 2006

1

HONORABLE MAUREEN A. TIGHE,
UNITED STATES BANKRUPTCY JUDGE

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am an employee in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to the within action; my business address is: 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067-5805.

On September 8, 2006 I served the foregoing document(s) described as:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE MOTION TO APPROVE: (1) SALE OF ASSETS FREE AND CLEAR OF LIENS AND INTERESTS; (2) ASSUMPTION AND ASSIGNMENT OF DESIGNATED EXECUTORY CONTRACTS; AND (3) REJECTION OF DESIGNATED EXECUTORY CONTRACTS**

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid in the United States mail at Los Angeles, California, addressed as follows:

See attached service list

| | |
|---|---|
| _____ | (By Mail) I caused such envelope with postage thereon, fully prepaid to be placed in the United States mail. Executed on September \_\_, 2006, at Los Angeles, California. |
| X | (By E-mail) I caused such document to be distributed via electronic mail (as indicated). Executed on September 8, 2006, at Los Angeles, California. |
| _____ | (By Facsimile) I caused said document to be sent via facsimile (as indicated). Executed on September \_\_\_, 2006, at Los Angeles, California. |
| _____ | (By Federal Express **and** Express Mail) I caused said document to be sent via Federal Express **or** for next business morning delivery. Executed on September \_\_, 2006, at Los Angeles, California. |
| _____ | (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct. |
| X | (Federal) I declare that I am an employee in the offices of a member of the State Bar of this Court at whose direction the service was made. |

Jason Klassi

E-mail Addresses:

lpeitzman@pwkllp.com; dshemano@pwkllp.com; ultra@vsnl.com;
basun@jonesday.com; kehertel@jonesday.com; kaschmitz@jonesday.com;
jshenson@ktbslaw.com; sedelman@gibsondunn.com; ogarza@gibsondunn.com;
snewman@gibsondunn.com; madler@gibsondunn.com; efromme@gibsondunn.com;
dperlman@perlmanlaw.com; sara.chenetz@dlapiper.com; eisrael@dgdk.com;
bspiegel@kirkland.com; lsinanyan@kirkland.com; clcatlaw@aol.com;
clcella@cellalaw.org; mark@sharflaw.com; mbrewer@hgblaw.com;
jlindsay@hgblaw.com; gklausner@stutman.com; msundelin@stutman.com;
dgould@mwe.com; jmsullivan@mwe.com; rsoref@buchalter.com;
arhim@buchalter.com; mrsal310@aol.com; ctrunkey@phoenixpictures.com;
fspecktor@caa.com; snewman@gibsondunn.com; david@grayboxllc.com;
jkohanski@geffner-bush.com; kerskine@geffner-bush.com; ljurich@loeb.com;
dfidler@ktbslaw.com; geg@msk.com; ldiamant@rdwlawcorp.com;
bdavidoff@rutterhobbs.com; fspecktor@caa.com; GJV@amclaw.com;
JSH@amclaw.com; sharelaw@aol.com; glassmanp@gtlaw.com;
mholtz@lavelysinger.com; crebhun@kayescholer.com; carlosp@racclaw.com;
hschochet@steefel.com; StarrA@GTLAW.com; jpb@brincko.com; rhavel@sidley.com;
rpark@sidley.com; sneely@sidley.com; skoenig@cmkllp.com; stregub@stpclaw.com