1  DAVID L. NEALE (SBN 141225)
   JULIET Y. OH (SBN 211414)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
   10250 Constellation Blvd., Suite 1700
3  Los Angeles, California 90067
   Telephone: (310) 229-1234
4  Facsimile: (310) 229-1244
   Attorneys for Franchise Pictures LLC, et al.
5
   STUART I. KOENIG (SBN 102764)
6  CREIM, MACIAS, KOENIG & FREY LLP
   633 West Fifth Street, 51st Floor
7  Los Angeles, California 90071
   Telephone:  (213) 614-1944
8  Facsimile:  (213) 615-1961
   Attorneys for SPE Holding Corp., et al.
9

LODGED

SEP - 8 2006

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
         Deputy Clerk

FILED

SEP  8 2006

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
         Deputy Clerk

ENTERED

SEP  8 2006

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY
         Deputy Clerk

            UNITED STATES BANKRUPTCY COURT

10

             CENTRAL DISTRICT OF CALIFORNIA

11

               SAN FERNANDO VALLEY DIVISION

12

13  In re                          ) Case No. SV 05-13855-MT
                                    ) Chapter 11
14  FRANCHISE PICTURES LLC, et al.  ) (Jointly Administered
                                    )
15              Debtors.            )
    _____     )
16  ☒   Affects All Debtors         )
    ☐   Affects Only:               )
17  _____ )
    In re                           ) Case No. SV 05-50077-MT
    SPE HOLDING CORP., et al.,       ) Chapter 11
18                                  ) (Jointly Administered)
                Debtors            )
19                                  )
                                    )
20                                  ) ORDER  GRANTING  MOTION  TO
                                    ) APPROVE:  (1)  SALE  OF  ASSETS
                                    ) FREE  AND  CLEAR  OF  LIENS  AND
21  ☒   Affects All Debtors         ) INTERESTS;  (2)  ASSUMPTION  AND
    ☐   Affects Only:               ) ASSIGNMENT  OF  DESIGNATED
22                                  ) EXECUTORY  CONTRACTS;  AND  (3)
                                    ) REJECTION  OF  DESIGNATED
23                                  ) EXECUTORY CONTRACTS
                                    )
24                                  )
                                    ) Date:    September 5, 2006
25                                  ) Time:    9:30 a.m.
                                    ) Place:   Courtroom "302"
26                                  )          21041 Burbank Blvd.
                                    )          Woodland Hills, CA
27                                  )
                                    )
28  _____ )

                                1

1    Hearings were held on August 11, August 23 and September 5,

2    2006 before the Honorable Maureen A. Tighe, United States

3    Bankruptcy Judge for the Central District of California, in

4    Courtroom "302" located at 21041 Burbank Blvd., Woodland Hills,

5    California, for the Court to consider the "Motion To Approve:

6    (1) Sale Of Assets Free And Clear Of Liens And Interests; (2)

7    Assumption And Assignment Of Designated Executory Contracts; And

8    (3) Rejection Of Designated Executory Contracts" (the "Sale

9    Motion") filed by Franchise Pictures LLC, Franchise Pictures,

10   Inc., Franchise Films LLC, Franchise Entertainment LLC, 3000

11   Miles Productions, Inc., Alex and Emma Productions, Inc., Auggie

12   Rose Productions, Inc., Battlefield Productions, LLC, Carter

13   Productions, LLC, Champs Productions Inc., Conprod, Inc.,

14   Heightened Productions Inc., Nine Yards Productions, LLC,

15   Phoenician Entertainment LLC, Pledge Productions, Inc., Rangers

16   Productions, Inc., Seraph Productions, Inc., Split Card Films,

17   Inc., Suite Productions LLC, Valentine Productions, Inc., VLN

18   Productions, Inc., TGD Productions, Inc., Phoenician

19   Entertainment, Inc., Nordhoff Rentals, Inc., Franchise Classics

20   Pictures, Inc., Franchise Creative Corp. and Franchise

21   Television LLC, as debtors and debtors in possession

22   (collectively, the "Franchise Debtors"), jointly administered

23   under Case No. SV 05-13855-MT, and Animal Productions, LLC,

24   Captured Productions, Inc., Cinema Holdings, Inc., Desperate,

25   Inc., Disorder Productions, Inc., Lost Angels Distributions,

Inc., Merciless Movies, Inc., Nine Yards Two Productions, Inc., Rabbitprod, Inc., Restrained Films, Inc., Ripped Films, Inc., Rumbling Productions, Inc., Saint Mortimer Films, Inc., Seabreeze Productions, Inc., Sever Productions, Inc., Silent Productions, Inc., Snake Eyes Productions, Inc., South Boondock Productions, Inc., Spartan Distribution, Inc., SPE Holding Corp., Stormy Productions, Inc., Twin Pictures Acquisition Corp., Unbelievable Productions, Inc., VS Productions, Inc., Zig Zag Productions, Inc. and Franchise Studios LLC, as debtors and debtors in possession (collectively, the "SPE Debtors," and, together with the Franchise Debtors, the "Debtors"), jointly administered under Chapter 11 Case No. SV 05-50077-MT, pursuant to which the Debtors requested an order (1) approving the sale of substantially all of the Debtors' assets to FPLAC LLC ("FPLAC") or a successful overbidder in accordance with the terms of that certain Asset Purchase Agreement executed by the parties on or about April 28, 2006 (the "APA"); (2) authorizing the assumption by the Debtors and assignment of certain executory contracts, as identified in Schedule 6.1 to the APA, as such Schedule may have been subsequently amended and attached to the Joint APA (as defined below) (the "Assumed Contracts"); (3) authorizing the rejection by the Sellers of certain executory contracts as identified in Schedule 6.2 to the APA, as such Schedule may have been subsequently amended and attached to the Joint APA (the "Rejected Contracts"); and (4) approving, in

1  the case of an alternate bidder tendering a higher and better

2  offer than FPLAC, the sale of such assets to an alternate bidder

3  pursuant to the terms and conditions of the approved bidding

4  procedures.   Appearances were as noted in the record of the

5  August 11, August 23 and September 5, 2006 hearings.

6

7      The Court, having considered the Sale Motion, the

8  accompanying Memorandum of Points and Authorities and evidence

9  filed by the Debtors, the oppositions to the Sale Motion (each,

10 an "Opposition," and collectively, the "Oppositions") filed by

11 ApolloProMedia, CB Productions, Inc., et al., Comerica Bank, La

12 Financiere Des Enterprises Culturelles, The Film Musicians

13 Secondary Markets Fund (the "Musicians Fund"), Intertainment

14 Licensing GmbH, The Kushner-Locke Company, MHF Zweite Academy

15 Film GmbH & CO., KG, et al., Morgan Creek Productions, Inc.

16 ("MCP") (including MCP's Motion to Compel Assumption of

17 Executory Contracts), New City Releasing, Programs 4 Media Ltd.,

18 Proteus Films Inc., et al., Elie Samaha, Sony Pictures Home

19 Entertainment Inc., Ultra Distributors Pvt. Ltd., and Warner

20 Bros., the Statement filed by the Writers Guild of America west,

21 Inc, for itself and its affiliate Writers Guild of America East,

22 Inc., the Screen Actors Guild, Inc., the Directors Guild of

23 America, Inc., and their respective pension and health plans,

24 the replies to the Oppositions and other pleadings with respect

25 to the Sale Motion filed by the Franchise Debtors, the SPE

26 Debtors, FPLAC and the Committee (as defined in the accompanying

4

1 Findings of Fact and Conclusions of Law) in further support of

2 the Sale Motion, and upon consideration of the Joint APA and the

3 Debtors' analysis of the bids received, and upon consideration

4 of and the oral arguments and statements of counsel made at the

5 hearings on the Sale Motion, and the testimony of Hans Turner

6 and David Bergstein at the August 23, 2006 hearing, and the

7 proffers of testimony at the September 5, 2006 hearing, and

8 based upon this Court's Findings of Fact and Conclusions of Law

9 entered concurrently herewith, and good cause appearing

10 therefor, it is hereby

11 ORDERED, that the Sale Motion shall be, and it is hereby,

12 granted as set forth herein; and it is further

13 ORDERED, that the joint asset purchase agreement (the

14 "Joint APA") among the Debtors, FPLAC and MCP, in the form

15 attached hereto as Exhibit "A," shall be, and it is hereby,

16 approved in its entirety and any terms not specifically defined

17 herein shall have the meanings ascribed to them in the Joint

18 APA; and it is further

19 ORDERED, that all Oppositions, including the MCP Motion to

20 Compel Assumption of Executory Contracts, that have not been

21 withdrawn are overruled; and it is further

22 ORDERED, that the Sale in accordance with the Joint APA is

23 authorized; and it is further

24 ORDERED, that all persons and entities are hereby

25 prohibited from taking any action that would interfere with the

1  Debtors' Sale and/or transfer of any of the Purchased Assets to

2  either of the Joint Purchasers in accordance with the terms of

3  the Joint APA and this Order; and it is further

4      ORDERED, that the Assumed Contracts (as designated in the

5  amended Schedules to the Joint APA), to the extent such

6  contracts are executory contracts within the meaning of 11

7  U.S.C. § 365, and any of the "Warner/Franchise Agreements" as

8  that term is defined in the Settlement Agreement, dated as of

9  August 10, 2006, among the Debtors and various affiliates of

10 Warner Bros. Pictures (the "WB Settlement Agreement"), to the

11 extent such contracts are executory, shall be assumed by the

12 Debtors and assigned to FPLAC and/or MCP, as specified in the

13 Joint APA; and it is further

14     ORDERED, that the Assumed Contracts (as designated in the

15 amended Schedules to the Joint APA) and any of the

16 Warner/Franchise Agreements not specifically identified on the

17 Schedules to the Joint APA, to the extent such contracts are

18 executory contracts within the meaning of 11 U.S.C. § 365, shall

19 be transferred and assigned to, and following the Closing Date

20 remain valid and binding and in full force and effect for the

21 benefit of, the applicable Joint Purchaser(s) in accordance with

22 their terms, notwithstanding any provision in the Assumed

23 Contracts (including those of the type described in sections

24 365(b)(2), (e)(1) and (f)(1) of the Bankruptcy Code) that

25 prohibits, restricts, or conditions such assignment or transfer;

1  and it is further

2     ORDERED, that, pursuant to section 365(k) of the Bankruptcy

3  Code, the Debtors shall be relieved from any further liability

4  with   respect   to   the   Assumed   Contracts   and   any   of   the

5  Warner/Franchise Agreements assigned to FPLAC or MCP, to the

6  extent such contracts are executory contracts within the meaning

7  of 11 U.S.C. § 365, after such assignment to and assumptions by

8  the applicable Joint Purchaser; and it is further

9

10    ORDERED, that the Debtors may reject each of the Rejected

11  Contracts (as designated in the amended Schedules to the Joint

12  APA) as specified in the Joint APA and such contracts are hereby

13  deemed rejected; and it is further

14

15    ORDERED, that this Order and the Joint APA shall be binding

16  upon  the  Debtors,  all  of  the  Debtors'  creditors,  and  any

17  trustees appointed in these proceedings or in any subsequent

18  proceedings under chapter 7 or chapter 11 of the Bankruptcy Code

19  relating to the Debtors; and it is further

20    ORDERED, that, in the absence of a notice from any party to

21  a Rejected Contract affirmatively exercising its rights under

22  Section 365(n) of the Bankruptcy Code, all Rejected Contracts

23  and any rights granted thereunder are hereby terminated; and it

24  is further

25

26    ORDERED, that, the Settlement Agreement (as defined in the

27  Joint APA) is binding on all parties thereto and that a closing

28  under the terms of the Joint APA shall constitute a "sale" under

1  the terms of the Settlement Agreement and shall remove any

2  condition precedent to the effectiveness of the Settlement

3  Agreement; and it is further

4      ORDERED, that, except as to any liabilities that have been

5  expressly assumed by the Joint Purchasers under the Joint APA,

6  including, without limitation, the obligations to the Union

7  Entities, pursuant to Section 363(f) of the Bankruptcy Code, all

8  assets sold by the Debtors by way of the Joint APA shall be sold

9  free and clear of any and all liens, claims, encumbrances and

10  interests, other than the liens, claims and encumbrances of WB

11  and the Union Entities, with such liens, claims, encumbrances

12  and interests to attach to the cash proceeds of the Sale payable

13  to the Debtors under the Joint APA in the same order, priority

14  and validity as the prepetition liens, claims, encumbrances and

15  interests, or as may have otherwise been agreed to in writing by

16  any party holding any such lien, claim, encumbrance or interest

17  and the Debtors; and it is further

18      ORDERED, that the right of Mobius to exercise any rights to

19  enter into any new agreements or amend any existing agreements

20  as Sales Agent or otherwise under the Assignment Agreement from

21  and after September 1, 2006, is hereby preliminary enjoined as

22  to the MCP Purchased Assets, and, as of the Closing Date, shall

23  be terminated and permanently enjoined as to the MCP Purchased

24  Assets.    Mobius shall retain all claims (other than claims

25  against the Debtors) and/or rights to receive payment (other

1    than such rights as they may relate to the Debtors), including,

2    without limitation, sales agency fees, based upon transactions

3    concluded by Mobius under the Assignment Agreement prior to

4    September 1, 2006.  To the extent that Mobius actually receives

5    gross receipts which derive from the MCP Purchased Assets which

6    Mobius is not entitled to receive and would otherwise would be

7    payable either to the Debtors or to MCP, then Mobius shall pay

8
9    those gross receipts over to MCP; and it is further

10       ORDERED, that the Debtors, as well as their officers,

11   employees, and agents, shall be, and hereby are, authorized,

12   empowered and directed to take any and all actions necessary or

13   appropriate to (i) consummate the Sale of the Purchased Assets

14   to the applicable Joint Purchaser pursuant to and in accordance

15   with the terms and conditions of the Joint APA, (ii) close the

16
17   Sale as contemplated in the Joint APA and this Order, and

18   (iii) execute and deliver, perform under, consummate, implement

19   and close fully the Joint APA, together with all additional

20   instruments and documents that may be reasonably necessary or

21   desirable to implement the Joint APA and the Sale, including any

22
23   other ancillary documents, or as may be reasonably necessary or

24   appropriate to the performance of the obligations as

25   contemplated by the Joint APA and such other ancillary

26   documents.  Any actions taken by the Debtors necessary or

27   desirable to consummate such transactions prior to the entry of

28   this Order should be, and they are hereby, ratified under the

1  circumstances; and it is further

2      ORDERED, that the Debtors shall use their reasonable best

3  efforts, on or prior to the Closing Date, either (1) to produce

4  to MCP true and correct copies of all agreements that Mobius

5  and/or any of its representatives or successors in interest have

6  entered into as putative foreign sales agent under the

7  Assignment Agreement or any amendment thereto with respect to

8  the MCP Purchased Assets that are in its possession, and/or (2)

9

10  to obtain for MCP access to the documents maintained by Mobius

11  so that MCP can obtain copies of such agreements on its own; and

12  it is further

13      ORDERED, that, except for (i) the Union Entities as

14  provided under the Joint APA and (ii) Warner (as that term is

15  defined in the WB Settlement Agreement), all persons and

16  entities holding any liens, claims or encumbrances against or

17  interests in the Purchased Assets hereby are forever barred,

18  estopped and permanently enjoined from asserting against either

19  of the Joint Purchasers or their successors or assigns, their

20  property or the Purchased Assets, such persons' or entities'

21  liens, claims, encumbrances against or interests in and to the

22  Purchased Assets; and it is further

23      ORDERED, that, on the Closing Date, and consistent with the

24  Joint APA, each creditor (other than the Union Entities and

25  Warner) holding a lien, claim or encumbrance on any of the

26  Purchased Assets is authorized to execute such documents and

27

28

1  take all other actions as may be requested by either of the

2  Joint Purchasers to release liens, claims or encumbrances

3  against or interests in and to the Purchased Assets, if any, as

4  provided for herein, as such liens, claims, encumbrances and

5  interests may have been recorded or may otherwise exist,

6  provided that a certified copy of this Order may be filed with

7  provided that a certified copy of this Order may be filed with

8  the appropriate clerk and/or recorded with the recorder to act

9  to cancel any of such liens, claims or encumbrances against or

10  interests in and to any of the Purchased Assets, except as

11  provided in the Joint APA; and it is further

12  ORDERED, that notwithstanding anything in the Joint APA or

13  in this Order to the contrary, in accordance with the WB

14  Settlement Agreement, (a) all of Warner's liens, mortgages and

15  security interests shall remain in full force and effect and

16  shall secure the claims and rights with respect to which the

17  liens, mortgages and security interests were granted, provided,

18  however, that such liens, mortgages and security interests shall

19  have the same priority, scope, validity and enforceability as

20  such liens, mortgages and security interests had as of August

21  18, 2004, and (b) except as otherwise provided by the WB

22  Settlement Agreement or that certain agreement dated as of

23  August 21, 2006 by and between MCP and Warner Bros. Pictures, a

24  division of WB Studio Enterprises Inc. (the "WB-MCP Agreement"),

25  Warner's rights of setoff and recoupment shall remain in full

26  force and effect against the Joint Purchasers; and it is further

27

28

1    ORDERED, that, in accordance with the WB Settlement

2    Agreement, the Debtors shall cause each of the Joint Purchasers,

3    with respect to the Warner/Franchise Agreements assigned to it,

4    to execute and deliver to Warner at the closing of the Sale an

5    acknowledgment in the form attached as Exhibit D to the WB

6    Settlement Agreement; and it is further

7

8    ORDERED that, if any contract that would otherwise be

9    rejected or terminated pursuant to the Joint APA or this Order

10    would constitute a "Chain of Title Agreement" as that term is

11    defined in the WB Settlement Agreement, such contract shall not

12    be deemed rejected or terminated pursuant to the Joint APA, this

13    Order, or otherwise; and it is further

14

15    ORDERED, that, in the event of any inconsistency between

16    the terms of the Joint APA or this Order and the terms of either

17    the WB Settlement Agreement or the WB-MCP Agreement, the terms

18    of the WB Settlement Agreement or the WB-MCP Agreement, as

19    applicable, shall control; and it is further

20    ORDERED, that nothing in this Order determines any of the

21    respective rights or claims of Warner and the Union Entities

22    against each other; and it is further

23

24    ORDERED, that FPLAC, having waived its rights under the APA

25    and the Procedures Order, is not entitled to a Breakup Fee as

26    that term is defined in the Procedures Order; and it is further

27    ORDERED, that, upon entry of this order, the WB Rights

28    Clarification Agreement (as that term is defined in the APA)

1  shall be terminated; and it is further

2      ORDERED, that, within three (3) business days following

3  entry of this Order, $750,000 constituting the WB Deposit, as

4  that term is defined in the APA, shall be returned to FPLAC or

5  its designee; and it is further

6

7      ORDERED, that MCP is acquiring the MCP Purchased Assets

8  subject to whatever valid residual obligations exist in favor of

9  the Musicians Fund on a prospective basis only; and it is

10 further

11     ORDERED, that, in the event of any inconsistency between

12 the terms of the Joint APA or this Order and the terms of that

13 certain Stipulation Among Debtors, FPLAC, LLC and Apollomedia

14 Resolving Opposition to Debtors' Motion To Approve: (1) Sale of

15 Assets Free and Clear Of Liens and Interests; (2) Assumption and

16 Assignment of Designated Executory Contracts; and (3) Rejection

17

18 of Designated Executory Contracts (the "Apollo Stipulation"),

19 the terms of the Apollo Stipulation shall control; and it is

20 further

21     ORDERED, that, consistent with the terms and conditions of

22 the settlement agreement between the Debtors and Comerica Bank

23 (the "Comerica Settlement"), following the Closing, the Debtors

24 shall be, and they are hereby, authorized and directed to pay

25 promptly to Comerica Bank from the proceeds of the Sale the sum

26 of $1,000,000 in full and final satisfaction of the allowed

27

28 secured claim of Comerica Bank (the "Comerica Allowed Secured

Claim") under the Comerica Settlement. Upon the full satisfaction of the Comerica Allowed Secured Claim under the terms and conditions of the Comerica Settlement, Comerica Bank is hereby directed to promptly take such steps as may reasonably be necessary to terminate any payment instructions, notices of assignment, copyright mortgages, or other documents that evidence either the existence of an obligation from the Debtors to Comerica Bank or a security interest in and lien upon any of the assets of any of the Debtors, and to promptly execute "Direction to Pay" or any other similar instructions to third parties as may be necessary so that all payments due are made to FPLAC or MCP, as applicable, following the Closing; and it is further

ORDERED, that the entry of this Order shall satisfy the condition precedent to the Joint Purchasers' obligation to close set forth in Section 13.9 of the Joint APA; and it is further

ORDERED, that the Joint APA will constitute an Alternate Bid under the APA, and Section 8.2 of the APA shall remain in full force and effect. FPLAC and the Debtors retain all of their respective rights, obligations and defenses arising out of or applicable to Section 8.2 of the APA; and it is further

ORDERED, that a back-up Sale to FPLAC under Section 8.2 of the APA shall be, and it is hereby, approved, and the Debtors are authorized to take all necessary actions to consummate such back-up Sale if the Joint APA has been terminated as provided in

Article 16 of the Joint APA.  The Court will hold a hearing on October 6, 2006 at 10:00 a.m. to further consider the status of the back-up Sale, and to enter such decisions and orders as may then be necessary and appropriate.  Should the Sale under the Joint APA close prior to the hearing on October 6, 2006, the Debtors shall file and serve upon those parties that have been served with a copy of this Order a written notice that a Closing has occurred, in which event the October 6, 2006 hearing shall be taken off calendar; and it is further

ORDERED, that, pursuant to Section 1146(a) of the Bankruptcy Code, no transfer, stamp or similar tax applies in any way to the Sale and the transactions contemplated in conjunction therewith; and it is further

ORDERED, that no bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale; and it is further

ORDERED, that the parties had no brokers involved in consummating the Sale and no brokers' commissions are due; and it is further

ORDERED, that the failure specifically to include any particular provision of the Joint APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Joint APA be authorized and approved in its entirety; and it is further

ORDERED, that, pursuant to Rules 2002 and 3003(c) of the

1    Federal Rules of Bankruptcy Procedure, any proof of claim for

2    damages arising from the rejection of any of the Rejected

3    Contracts that are executory contracts under 11 U.S.C. § 365

4    must be filed by the respective claimant on or before 30 days

5    after the date of entry of this Order; and it is further

6

7        ORDERED, that this Order is a final order and shall be

8    entered forthwith and not subject to a stay under Rules 6004(h)

9    or 6006(d) of the Federal Rules of Bankruptcy Procedure; and it

10   is further

11       ORDERED, that the Joint APA and any related agreements,

12   documents or other instruments may be modified, amended or

13   supplemented by the parties thereto consistent with the terms of

14   the Joint APA, without further order of the Court upon

15   appropriate notice and opportunity for a hearing, provided that

16

17   any such modification, amendment or supplement does not have a

18   material adverse effect on the Debtors' estates; and it is

19   further

20       ORDERED, that, as of the Closing Date, each Debtor

21   constitutes MCP with respect to the MCP Purchased Assets and

22   FPLAC with respect to the FPLAC Purchased Assets, their

23   respective successors and assigns, the true and lawful agents

24   and attorneys-in-fact of the Debtors, with full power of

25   substitution and resubstitution, in whole or in part, in the

26   names and stead of the applicable Debtors, by and on behalf of

27   and for the benefit of, each of the respective Joint Purchasers

28

1    and their successors and assigns, from time to time (i) to

2    demand, receive, and collect any and all of the Purchased

3    Assets, and to give receipts and releases for and in respect of

4    the same, or any part thereof; (ii) to institute and prosecute

5    for the benefit of either of the Joint Purchasers, their

6    successors and assigns, any and all proceedings at law, in

7

8    equity, or otherwise, that either of the Joint Purchasers or

9    their successors and assigns may deem proper in order to collect

10   or reduce to possession the Purchased Assets or to collect or

11   enforce any claim or right of any kind included in the Purchased

12   Assets; and (iii) to do all things legally permissible or

13   required, or reasonably deemed by either of the Joint

14   Purchasers, their successors or assigns to be required, to

15

16   recover and collect the Purchased Assets and to use the Debtors'

17   names in such manner as either of the Joint Purchasers, their

18   successors or assigns may reasonably deem necessary for the

19   collection and recovery of same; provided, however, that none of

20   the foregoing rights afforded to the Joint Purchasers shall

21   obligate the Debtors to take any action or initiate any

22   litigation on behalf of the Joint Purchasers, and the Joint

23

24   Purchasers shall not take any action in the name of the Debtors

25   to the extent such action would obligate the Debtors to obtain

26   approval of such action from the Bankruptcy Court or take any

27   other legal action; and it is further

28       ORDERED, that, this Order is and shall be binding upon and

1   govern the acts of all persons and entities, including, without

2   limitation, all filing agents, filing officers, title agents,

3   title companies, recorders of mortgages, recorders of deeds,

4   registrars of deeds, administrative agencies, governmental

5   departments, secretaries of state, federal and local officials,

6   and all other persons and entities who may be required by

7   operation of law, the duties of their office, or contract, to

8   accept, file, register or otherwise record or release any

9   documents or instruments, or who may be required to report or

10  insure any title or state of title in or to any lease; and each

11  of the foregoing persons and entities is hereby directed to

12  accept for filing any and all of the documents and instruments

13  necessary and appropriate to consummate the transactions

14  contemplated by the Joint APA; and it is further

15       ORDERED, that the Court shall retain jurisdiction to, among

16  other things, interpret, implement, and enforce the terms and

17  provisions of this Order and the Joint APA, all amendments

18  thereto and any waivers and consents thereunder and each of the

19  agreements executed in connection therewith to which the Debtors

20  are a party, and to adjudicate, if necessary, any and all

21  disputes concerning or relating in any way to the Sale.

22  Dated:  September  8 , 2006

23

24

25

26

27       HONORABLE MAUREEN A. TIGHE,
         UNITED STATES BANKRUPTCY JUDGE

28

EXECUTION VERSION

ASSET PURCHASE AGREEMENT

between

FRANCHISE PICTURES LLC AND CERTAIN AFFILIATES

DEBTORS AND DEBTORS IN POSSESSION

and

SPE HOLDING CORP. AND CERTAIN AFFILIATES

DEBTORS AND DEBTORS IN POSSESSION

and

FPLAC LLC

and

MORGAN CREEK PRODUCTIONS, INC.

DATED AS OF SEPTEMBER 1, 2006


EXHIBIT A

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ............................................................................... 3

    Section 1.1    Definitions ............................................................................ 3

    Section 1.1.    Other Defined Terms .......................................................... 10

    Section 1.2.    Other Meanings .................................................................. 10

ARTICLE 2 PURCHASE AND SALE ............................................................. 10

    Section 2.1.    FPLAC Purchase and Sale .................................................. 10

    Section 2.2.    MCP Purchase and Sale ...................................................... 10

    Section 2.3.    Joint Bid for the Purchased Assets ..................................... 11

ARTICLE 3 DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS;
    ASSUMPTION OF LIABILITIES ................................................. 11

    Section 3.1.    Purchased Assets ................................................................ 11

    Section 3.2.    Allocation of Assets ........................................................... 16

    Section 3.3.    Excluded Assets ................................................................. 16

    Section 3.4.    Assumed Liabilities; Non-Assumed Liabilities. .................. 16

    Section 3.5.    Treatment of Guild Claims. ................................................ 17

    Section 3.6.    FPLAC Other Assumed Liabilities ..................................... 19

    Section 3.7.    MCP Other Assumed Liabilities ......................................... 20

    Section 3.8.    Assignment Agreement ....................................................... 20

ARTICLE 4 PURCHASE PRICE ................................................................... 20

    Section 4.1.    Purchase Price .................................................................... 20

    Section 4.2.    Deposit; Payment of Purchase Price. .................................. 20

    Section 4.3.    Allocation of Purchase Price ............................................... 21

    Section 4.4.    Adjustments to Purchase Price ............................................ 21

    Section 4.5.    Application or Return of Deposits ....................................... 22

i

ARTICLE 5 PROCEDURES AND APPROVALS................................................................22

    Section 5.1.    Due Diligence Materials ........................................22

    Section 5.2.    Bankruptcy Court Proceedings. ................................23

    Section 5.3.    Certain Bankruptcy Undertakings by the Sellers.........23

    Section 5.4.    Withdrawal of Complaint .....................................24

    Section 5.5.    FPLAC APA ...................................................24

ARTICLE 6 ASSUMPTION AND REJECTION OF CONTRACTS .....................................24

    Section 6.1.    Assumed Contracts ...........................................24

    Section 6.2.    Requirements to Assume and Assign Assumed Contracts ...............25

    Section 6.3.    Rejected Contracts ...........................................25

ARTICLE 7 INSTRUMENTS OF TRANSFER AND ASSUMPTION ..................................25

    Section 7.1.    Transfer Documents ..........................................25

ARTICLE 8 CLOSING ........................................................................................25

    Section 8.1.    Closing Date.................................................25

    Section 8.2.    Alternate Closing with MCP..................................26

    Section 8.3.    Alternate Closing with FPLAC ..............................26

ARTICLE 9 SELLERS' REPRESENTATIONS AND WARRANTIES ...................................26

    Section 9.1.    Organization, Qualification and Corporate Power.............26

    Section 9.2.    Authorization, Execution and Delivery of Agreement and Transaction Documents ........................26

    Section 9.3.    Title to and Condition of Assets ............................27

    Section 9.4.    Ownership in Non-Debtors ..................................27

    Section 9.5.    No Violation of Laws or Agreements ........................27

    Section 9.6.    Brokers.....................................................27

    Section 9.7.    No Undisclosed Liabilities...................................27

    Section 9.8.    Governmental Approvals ....................................28

K&E 11315007.8

ARTICLE 10 PURCHASER'S REPRESENTATIONS AND WARRANTIES.......................... 28

    Section 10.1.    Organization; Qualification and Corporate Power ........................... 28

    Section 10.2.    Governmental Approvals ................................................................. 28

    Section 10.3.    Authorization, Execution and Delivery of Agreement and Transaction Documents ................................................................. 28

    Section 10.4.    Brokers............................................................................................ 28

    Section 10.5.    Funding .......................................................................................... 28

    Section 10.6.    Authority to Credit Bid R2D2 Claim................................................ 29

    Section 10.7.    Ownership of Assets ...................................................................... 29

ARTICLE 11 DISCLAIMER OF WARRANTIES..................................................................... 29

    Section 11.1.    Disclaimer of Warranties ................................................................ 29

ARTICLE 12 SELLER'S AND PURCHASER'S COVENANTS ............................................ 30

    Section 12.1.    Conduct of Business ...................................................................... 30

    Section 12.2.    Mutual Covenants .......................................................................... 30

    Section 12.3.    Filings and Authorizations............................................................... 31

    Section 12.4.    Access and Information .................................................................. 31

    Section 12.5.    Public Announcement..................................................................... 32

    Section 12.6.    Taxes.............................................................................................. 32

    Section 12.7.    Consents......................................................................................... 32

    Section 12.8.    Good Faith Efforts .......................................................................... 33

    Section 12.9.    Further Assurances......................................................................... 33

    Section 12.10.    No Survival of Representations and Warranties............................... 33

    Section 12.11.    Preserved Claims .......................................................................... 33

    Section 12.12.    Non-Assignment by Sellers ........................................................... 33

    Section 12.13.    Litigation......................................................................................... 33

K&E 11315007.8

ARTICLE 13 CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO
     CLOSE ................................................................................................................ 34

    Section 13.1.    Accuracy of Representations and Warranties; Performance of
                 this Agreement ......................................................................................... 34

    Section 13.2.    Bankruptcy Matters .......................................................................... 34

    Section 13.3.    Consents .............................................................................................. 34

    Section 13.4.    No Material Adverse Change or Destruction of Property ................. 34

    Section 13.5.    Outside Closing Date ......................................................................... 35

    Section 13.6.    Insurance Related Matters ................................................................ 35

    Section 13.7.    Good Faith Purchaser ....................................................................... 35

    Section 13.8.    Delivery of Transaction Documents ................................................ 35

    Section 13.9.    Assignment Agreement ..................................................................... 35

ARTICLE 14 CONDITIONS PRECEDENT TO SELLERS' OBLIGATION TO CLOSE ....... 35

    Section 14.1.    Accuracy of Representations and Warranties; Performance of
                 this Agreement ......................................................................................... 35

    Section 14.2.    Authorizing Resolutions ................................................................... 36

    Section 14.3.    Due Diligence Materials .................................................................... 36

    Section 14.4.    Good Faith Purchaser ....................................................................... 36

    Section 14.5.    Satisfaction of All Cure Payments ................................................... 36

    Section 14.6.    Bankruptcy Matters .......................................................................... 36

    Section 14.7.    Outside Closing Date ......................................................................... 36

    Section 14.8.    Allocation of R2D2 Claim ................................................................ 36

    Section 14.9.    Delivery of Transaction Documents ................................................ 37

ARTICLE 15 INDEMNIFICATION ................................................................................. 37

    Section 15.1.    Indemnification by FPLAC .............................................................. 37

    Section 15.2.    Indemnification by MCP .................................................................. 37

    Section 15.3.    Determination of Damages and Related Matters ............................. 37

iv

Section 15.4.    Notice of Indemnification. ................................................. 37

Section 15.5.    Indemnification Procedure for Third Party Claims ........................... 37

ARTICLE 16 TERMINATION ................................................................. 38

Section 16.1.    Breaches and Defaults; Opportunity to Cure ..................................... 38

Section 16.2.    Termination .................................................................. 39

ARTICLE 17 MISCELLANEOUS ............................................................. 39

Section 17.1.    Additional Instruments of Transfer ................................................ 39

Section 17.2.    Notices ...................................................................... 40

Section 17.3.    Expenses .................................................................... 42

Section 17.4.    Governing Law ............................................................... 42

Section 17.5.    Assignment .................................................................. 42

Section 17.6.    Successors and Assigns ....................................................... 42

Section 17.7.    Amendments; Waivers ........................................................ 42

Section 17.8.    Entire Agreement ............................................................. 43

Section 17.9.    Counterparts ................................................................. 43

Section 17.10.   Severability ................................................................. 43

Section 17.11.   Section Headings ............................................................. 43

Section 17.12.   Interpretation ................................................................ 43

Section 17.13.   Reasonable Access to Records and Certain Personnel ..................... 43

Section 17.14.   Committee Opportunity to Review Pleadings and Orders ................. 44

Section 17.15.   Third Parties ................................................................. 44

Section 17.16.   Escrow Holder Matters ....................................................... 44

v

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of September 1, 2006 by and among Franchise Pictures LLC ("Franchise"), Franchise Pictures, Inc., Franchise Films LLC, Franchise Entertainment LLC, 3000 Miles Productions, Inc., Alex and Emma Productions, Inc., Auggie Rose Productions, Inc., Battlefield Productions, LLC, Carter Productions, LLC, Champs Productions Inc., Conprod, Inc., Heightened Productions Inc., Nine Yards Productions, LLC, Phoenician Entertainment LLC, Pledge Productions, Inc., Rangers Productions, Inc., Seraph Productions, Inc., Split Card Films, Inc., Suite Productions LLC, Valentine Productions, Inc., VLN Productions, Inc., TGD Productions, Inc., Phoenician Entertainment, Inc., Nordhoff Rentals, Inc., Franchise Classics Pictures, Inc., Franchise Creative Corp. and Franchise Television LLC, as debtors and debtors in possession (collectively, the "Franchise Debtors"), jointly administered under Case No. SV 05-13855-MT (the "Bankruptcy Case") in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division, Honorable Maureen A. Tighe, United States Bankruptcy Judge (the "Bankruptcy Court"), and Animal Productions, LLC, Captured Productions, Inc., Cinema Holdings, Inc., Desperate, Inc., Disorder Productions, Inc., Lost Angels Distributions, Inc., Merciless Movies, Inc., Nine Yards Two Productions, Inc., Rabbitprod, Inc., Restrained Films, Inc., Ripped Films, Inc., Rumbling Productions, Inc., Saint Mortimer Films, Inc., Seabreeze Productions, Inc., Sever Productions, Inc., Silent Productions, Inc., Snake Eyes Productions, Inc., South Boondock Productions, Inc., Spartan Distribution, Inc., SPE Holding Corp., Stormy Productions, Inc., Twin Pictures Acquisition Corp., Unbelievable Productions, Inc., VS Productions, Inc., Zig Zag Productions, Inc. and Franchise Studios LLC ("Studios"), as debtors and debtors in possession (collectively, the "SPE Debtors," and, together with the Franchise Debtors, the "Debtors" or "Sellers"), jointly administered under Chapter 11 Case No. SV 05-50077-MT (the "SPE Bankruptcy Case," and, together with the Original Bankruptcy Case, the "Bankruptcy Case") in the Bankruptcy Court, FPLAC LLC, a Delaware limited liability company, or its permitted designee ("FPLAC") on the one hand, and, Morgan Creek Productions, Inc., a Delaware corporation, or its designee ("MCP"), on the other hand (together, "Purchaser").

## RECITALS

WHEREAS, on August 18, 2004, Franchise Pictures LLC, Franchise Pictures, Inc., Franchise Films LLC, Franchise Entertainment LLC, 3000 Miles Productions, Inc., Alex and Emma Productions, Inc., Auggie Rose Productions, Inc., Battlefield Productions, LLC, Carter Productions, LLC, Champs Productions Inc., Conprod, Inc., Heightened Productions Inc., Nine Yards Productions, LLC, Phoenician Entertainment LLC, Pledge Productions, Inc., Rangers Productions, Inc., Seraph Productions, Inc., Split Card Films, Inc., Suite Productions LLC, Valentine Productions, Inc., VLN Productions, Inc. each commenced its respective Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as defined in Article 1 hereof) with the Bankruptcy Court; and

WHEREAS, on August 23, 2004, TGD Productions, Inc. commenced its Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court; and

1

WHEREAS, on March 11, 2005, Phoenician Entertainment, Inc., Nordhoff Rentals, Inc., Franchise Classics Pictures, Inc., Franchise Creative Corp. and Franchise Television LLC, each a wholly-owned subsidiary of Franchise Pictures LLC, commenced its Bankruptcy Case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court; and

WHEREAS, on November 21, 2005, Animal Productions, LLC, Captured Productions, Inc., Cinema Holdings, Inc., Desperate, Inc., Disorder Productions, Inc., Lost Angels Distributions, Inc., Merciless Movies, Inc., Nine Yards Two Productions, Inc., Rabbitprod, Inc., Restrained Films, Inc., Ripped Films, Inc., Rumbling Productions, Inc., Saint Mortimer Films, Inc., Seabreeze Productions, Inc., Sever Productions, Inc., Silent Productions, Inc., Snake Eyes Productions, Inc., South Boondock Productions, Inc., Spartan Distribution, Inc., SPE Holding Corp., Stormy Productions, Inc., Twin Pictures Acquisition Corp., Unbelievable Productions, Inc., VS Productions, Inc. and Zig Zag Productions, Inc. each commenced its respective bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court; and

WHEREAS, on December 1, 2005, Studios commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court; and

WHEREAS, Sellers are continuing to manage their affairs as debtors and debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, Sellers wish to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (as hereinafter defined), together with the Assumed Liabilities (as hereinafter defined), of Sellers upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, FPLAC and MCP each wishes to purchase and take delivery of certain of such Purchased Assets and assume certain of such Assumed Liabilities upon such terms and subject to such conditions;

WHEREAS, the Purchased Assets will be sold pursuant to a Sale Order (as hereinafter defined) of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assumption and assignment of certain Executory Contracts, unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code and the terms and conditions of this Agreement; and

WHEREAS, all of the obligations of the Sellers under this Agreement are conditioned upon the approval of the Bankruptcy Court in accordance with Article 5 hereof.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

2

K&E 11315007.8

# ARTICLE 1
## DEFINITIONS

Section 1.1    Definitions. For purposes of this Agreement and any schedules hereto or other Transaction Documents, the following terms shall have the following meanings:

"Affiliate" means any Person, which, directly or indirectly, is in control of, is controlled by, or is under common control with, another Person. For purposes of this definition, a Person shall be deemed to be "controlled by" another Person if such latter Person possesses, directly or indirectly, power either to direct or cause the direction of the management and policies of such controlled Person whether by contract or otherwise.

"Assignment Agreement" means that certain Assignment Agreement between Mobius, Franchise and Franchise Studios LLC purportedly executed on or about June 7, 2004 and purported to be effective as of February 1, 2004, and the First Amendment to Assignment Agreement dated as of June 7, 2004.

"Assumed Contract Rights" means those rights, powers, privileges, defenses (including setoff and/or recoupment rights), and remedies that may exist with respect to any Assumed Contract, other than Avoidance Claims (except to the extent necessary for defenses (except to the extent any such defense would constitute an Avoidance Claim hereunder), setoff and/or recoupment rights).

"Assumed Contracts" shall have the meaning ascribed to that term in Section 6.1, below.

"Assumed Liabilities" means those Liabilities separately assumed by MCP and by FPLAC, respectively, pursuant to Section 3.4 through Section 3.7 below.

"Avoidance Claims" means any and all claims of the Sellers arising under Chapter 5 of the Bankruptcy Code, but excluding rights of setoff and recoupment to the extent related to an Assumed Contract.

"Bankruptcy Code" means 11 U.S.C. Section 101, et. seq., and any amendments thereof operative at the time of the Original Bankruptcy Case.

"Closing" shall have the meaning ascribed in Section 8.1, below.

"Committee" means the Official Committee of Unsecured Creditors appointed and serving in the Original Bankruptcy Case.

"Contract" or "Contracts" means any written or oral contract, agreement, lease, license, instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"Covered Pictures" means those theatrical or television motion pictures of the Sellers that were produced subject to collective bargaining agreements with or on behalf of one or more Union Entities and are listed on Schedule 3.5 hereto.

3

"Guild Note 1" means the promissory note in the original amount of One Million Five Hundred Thousand Dollars ($1,500,000) to be provided by FPLAC to the Guilds upon the Closing. This note shall be payable annually over a period of three (3) years upon the earlier of (x) each anniversary of Guild Note 1 or (y) out of SPE Library Proceeds with Seventy Five Percent (75%) of SPE Library Proceeds for any given year being paid to the Guilds until such time as such payments to the Guilds in that year equal the Percentage Payment; provided, however, that in the final year of Guild Note 1, the percentage set forth in clause (y), above, shall be Fifty Percent (50%). Until paid in full or until the maturity date thereof, Guild Note 1 shall bear interest at a rate per annum equal to the London Interbank Offering Rate, as calculated at the mid-point of each year following the Closing Date, the first such year to start from the Closing Date and continue until the anniversary thereof. In the event of default, interest shall apply to all payments in default, until paid, at the rate of 11% per annum; and

"Guild Note 2" means the promissory note in the original amount of Two Million Dollars ($2,000,000) to be provided by MCP to the Guilds upon the Closing in a form to be agreed upon and subsequently attached hereto as Exhibit 3.5(d)(iv). This note shall be payable over a period of five (5) years solely from, and with recourse only to, the actual cash Net Proceeds collected by MCP from distribution of the film *Driven*. The aggregate payment under this note shall not exceed Two Million Dollars ($2,000,000) plus interest accrued until paid in full or the maturity date, whichever is earliest. Until paid in full or until the maturity date thereof, Guild Note 2 shall bear interest at a rate per annum equal to the London Interbank Offering Rate, as calculated at the mid-point of each year following the Closing Date, the first such year to start from the Closing Date and continue until the anniversary thereof. It shall not be an event of default under Guild Note 2 if said actual cash Net Proceeds collected and paid by MCP to the Guilds do not aggregate Two Million Dollars ($2,000,000), plus interest, during the five (5) year term of Guild Note 2.

"Guild Note 3" means the promissory note in the original amount of Four Hundred Thousand Dollars ($400,000) to be provided by MCP to the Guilds upon the Closing in a form to be agreed upon and subsequently attached hereto as Exhibit 3.5(d)(iv). This note shall be payable over a period of five (5) years from the actual cash Net Proceeds collected by MCP from distribution of the film *City By The Sea*; provided, however, that on the maturity date, Guild Note 3 shall be paid off in full. The aggregate payment under this note shall not exceed Four Hundred Thousand Dollars ($400,000) plus interest accrued until paid in full or the maturity date, whichever is earliest. Until paid in full or until the maturity date thereof, Guild Note 3 shall bear interest at a rate per annum equal to the London Interbank Offering Rate, as calculated at the mid-point of each year following the Closing Date, the first such year to start from the Closing Date and continue until the anniversary thereof.

"Guild Notes" means Guild Note 1, Guild Note 2 and Guild Note 3.

"Guild Payment 1" means One Million One Hundred Fifty Thousand Dollars ($1,150,000) in Good Funds payable by FPLAC to the Guilds.

"Guild Payment 2" means Two Million One Hundred Thousand Dollars ($2,100,000) in Good Funds payable by MCP to the Guilds.

5

"Guild Payments" means Guild Payment 1 and Guild Payment 2.

"Guild Release" means the Settlement and Release Agreement in a form to be agreed upon and subsequently attached hereto as Exhibit 3.5(d)(iii)(1) with respect to the FPLAC Purchased Assets and 3.5(d)(iii)(2) with respect to the MCP Purchased Assets .

"Guilds" means the Writers Guild of America west, Inc, for itself and its affiliate Writers Guild of America East, Inc. (collectively, "WGA"), the Screen Actors Guild, Inc., the Directors Guild of America, Inc., and their respective pension and health plans.

"Hearing Deadline" means the date for the hearing on the Sale Motion which, unless extended by mutual agreement of the Parties, shall be no later than September 14, 2006.

"Knowledge" means (i) in the case of the Franchise Debtors, the actual, current knowledge as of the date hereof (without inquiry) of John P. Brincko, (ii) in the case of the SPE Debtors, the actual, current knowledge as of the date hereof (without inquiry) of David Bergstein and/or Hans Turner, and (iii) in the case of FPLAC, the actual, current knowledge as of the date hereof of David Bergstein and Hans Turner.

"Law" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order, case law decision or other requirement or rule of law.

"Liability" or "Liabilities" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, secured or unsecured, pre-petition or administrative.

"Library Proceeds" means all monies collected in connection with exploitation of the FPLAC Purchased Assets, net of the following deductions: (i) fees charged by an approved collection agent with respect to Post-Transfer Collections (Fintage House and Freeway Entertainment as collection agents are pre-approved); (ii) all distribution costs, expenses and fees payable to sales agents and/or distributors in connection with Post-Transfer Collections, provided, however, that all fees to any sales agent or distributor which is an affiliate of FPLAC shall be limited to market rates for the particular project, which shall not exceed Twenty Percent (20%) for provision of sales agency services; (iii) all Post-Closing Union Entity Claims assumed by FPLAC; (iv) all payroll house expenses associated with disbursement of residuals payments in the form and manner prescribed by each applicable collective bargaining agreement (Entertainment Partners and Film Payroll Services are pre-approved); (v) all marketing, advertising, promotional and manufacturing fees, costs and expenses; (vi) all talent and other participations, bonuses and perquisite expenses; (vii) taxes and withholding (excluding income taxes payable by FPLAC or its affiliates and subsidiaries); and (viii) judgments, settlements and fees, costs and expenses incurred in connection with defending, preserving and prosecuting all rights (including, without limitation, copyrights) of the Purchased Assets in connection with the exploitation thereof (i.e., actual and threatened third party claims seeking monetary damages and/or to restrict or otherwise affect the exploitation of any of the Purchased Assets). Until Guild Note 1 is paid in full, Library Proceeds will be calculated and reports provided to the Guilds on a quarterly basis.

6

"Lien" or "Liens" means any security interests, mortgages, interests, liens, pledges, charges, and other rights or claims of third parties.

"Mobius" means Mobius International, Inc., in its capacity as sales agent under the Assignment Agreement.

"Musicians Fund" means the Film Musicians Secondary Markets Fund.

"Net Proceeds" means the net amount of the cash proceeds actually collected by MCP in U.S. Dollars from distribution of the applicable film after first deducting a twenty percent (20%) distribution fee and then all costs and expenses of distribution and exploitation paid or incurred in connection with the applicable film (including, without limitation, (i) amounts pursuant to any applicable collective bargaining agreement, (ii) customary "off the top" costs and expenses, (iii) all third party participations, deferments and other contingent payments, (iv) all marketing, advertising, promotional and manufacturing fees, costs and expenses, (v) all talent and other participations, bonuses and perquisite expenses, (vi) taxes and withholding (excluding income taxes payable by MCP or its affiliates and subsidiaries), and (vii) judgments, settlements and fees, costs and expenses incurred in connection with defending, preserving and prosecuting all rights (including, without limitation, copyrights) of the MCP Purchased Assets in connection with the exploitation thereof (i.e., actual and threatened third party claims seeking monetary damages and/or to restrict or otherwise affect the exploitation of any of the MCP Purchased Assets; provided however, that the distribution fee with respect to distribution of the applicable film in the U.S. and Canada shall include any and all fees charged by WB or any other domestic subdistributor).

"Non-Assumed Liabilities" means any and all Liabilities of any and all of the Sellers that are not Assumed Liabilities, including, without limitation, all Liabilities of the Sellers to the Pension Funds that accrue prior to the Closing.

"Ordinary Course of Business" means the current course of business conducted by each Seller in its respective Bankruptcy Case consistent with past custom and practice (including with respect to quantity and frequency).

"Party" means any signatory to this Agreement.

"Pension Funds" means the Motion Picture Industry Pension and Health Plans ("MPIPHP") and the Musicians Fund, collectively.

"Person" means any corporation, partnership, limited liability company, joint venture, business association, entity or individual.

"Post-Closing Guild Liens" means (a) the security interests granted to each Guild by FPLAC in and upon each of the applicable Covered Pictures, in the form attached hereto as Exhibit 3.5(d)(v)(i), to secure FPLAC's performance of all obligations under Guild Note 1, which security interests shall be cross-collateralized by each and every applicable Covered Picture, but which shall automatically terminate immediately upon FPLAC repaying Guild Note 1 in full, (b) the security interest granted to each Guild by MCP after the Closing only upon the film *Driven*, in a form to be agreed upon and subsequently attached hereto as Exhibit

7

3.5(d)(v)(ii), to secure MCP's performance of all obligations under Guild Note 2, which security interests shall automatically and immediately terminate upon the earlier of MCP repaying Guild Note 2 in full or the maturity date of Guild Note 2, and (c) the security interest granted to each Guild by MCP after the Closing only upon the film *City By The Sea*, in a form to be agreed upon and subsequently attached hereto as Exhibit 3.5(d)(v)(iii), to secure MCP's performance of all obligations under Guild Note 3, which security interests shall automatically and immediately terminate upon MCP repaying Guild Note 3 in full.

"Post-Closing Union Entity Claims" means any and all claims by each Union Entity in connection with obligations arising under each Union Entity Assumption Agreement after the Closing; but residuals and pension and health contributions associated therewith shall not include claims that accrue prior to the Closing.

"Post-Transfer Collections" means all Good Funds actually received (net of credits, offsets, refunds or returns except as may be credited, offset, refunded or returned for the benefit of any entity affiliated or under common control with FPLAC) after the Closing from the exploitation of the FPLAC Purchased Assets.

"Pre-Closing Guild Claims" means any and all claims of the Guilds with respect to the Covered Pictures that have accrued on or prior to the Closing.

"Pre-Existing Guild Liens" means any and all validly-perfected, duly-enforceable liens and security interests held by one or more Guilds in any of the Covered Pictures prior to the Closing.

"Preserved Claims" means (i) any and all claims arising on or prior to the Closing of the Sellers against Comerica Bank, Elie Samaha and Andrew Stevens and (ii) any claims arising on or prior to the Closing against any Affiliate or "insider" (as defined in Section 101(31) of the Bankruptcy Code) of the Persons identified in subparagraph (i) above except for the Settled Claims; provided, however, that in the event that any of the immediately preceding rights included in the Preserved Claims materially interfere with or impede either FPLAC's or MCP's reasonable use and exploitation of the FPLAC Purchased Assets or MCP Purchased Assets respectively, the matter will be presented to the Bankruptcy Court to determine an equitable remedy to allow the Sellers to prosecute the Preserved Claims while allowing FPLAC the right to fully exploit the FPLAC Purchased Assets and MCP the right to fully exploit the MCP Purchased Assets.

"Procedures Motion" means the motion filed with the Bankruptcy Court on or about May 11 seeking entry of an order approving the bid procedures for a sale to FPLAC or an alternative bidder.

"Purchase Price" shall have the meaning ascribed to that term in Article 4, below.

"Purchased Assets" shall have the meaning ascribed to that term in Section 3.1, below.

"Qualified Bidder" shall have the meaning ascribed to that term in the Sale Procedures Order.

8

"R2D2" means R2D2 LLC, a California limited liability company.

"R2D2 Claim" means the claim of R2D2 which, solely for purposes of this Agreement and subject to the Bankruptcy Court approval of the Settlement Agreement, shall be deemed to be secured by a valid lien upon and security interest in the Sellers' assets, allowed pursuant to the Settlement Agreement (as may be reflected in the Settlement Order) in the amount of Ten Million Dollars ($10,000,000), and allocated among the Sellers pursuant to Section 4.4, below.

"Rejected Contracts" shall have the meaning ascribed to that term in Section 6.3, below.

"Residuals Adjustment Event" means adjustment of the Guild Payment 1 by mutual agreement of the Guilds and FPLAC or as may be determined by a tribunal of competent jurisdiction upon a Closing occurring after October 4, 2006.

"Sale Motion" means the motion filed on June 9, 2006 for entry of a Sale Order seeking, inter alia, authority for the Sellers to sell and assign, among other things, the Purchased Assets to FPLAC or an alternative bidder in accordance with the terms and conditions of the FPLAC APA.

"Sale Order" means an order granting the Sale Motion, as modified pursuant to the terms of this Agreement, in a form reasonably acceptable to FPLAC, MCP and the Debtors, which order shall authorize the Sellers to sell and assign the FPLAC Purchased Assets to FPLAC and the MCP Purchased Assets to MCP in accordance with the terms and conditions of this Agreement.

"Sale Procedures Order" means the order entered on June 5, 2006, granting the Procedures Motion and approving the bid procedures set forth therein.

"Settled Claims" means those claims of the Sellers, or any of them, against R2D2, E-Group Services, Inc., Mobius, David Bergstein and all of their or his respective officers, directors, shareholders, members, managers, employees, agents and affiliates which have been settled pursuant to that certain Settlement and Release Agreement dated as of May 5, 2006 (the "Settlement Agreement"), which is subject to approval by a Final Order of the Bankruptcy Court in the Bankruptcy Case (the "Settlement Order").

"SPE Assets" means all of the Purchased Assets that constitute property of the SPE Debtors' bankruptcy estates pursuant to Section 541 of the Bankruptcy Code.

"Tax" or "Taxes" means any taxes, charges, duties, assessments, fees, levies, imposts, or similar governmental assessments, together with any interest, penalties, and additions to tax, imposed by any taxing authority, wherever located (i.e., whether federal, state, local, municipal, or foreign), including all net income, gross income, gross receipts, net receipts, sales, use, goods and services, transfer, franchise, privilege, profits, social security, disability, withholding, payroll, telecommunications, utility user, unemployment, employment, employer health, excise, capital, capital gains, severance, property, windfall profits, value added, ad valorem, or occupation tax, or any other similar governmental charge or imposition, and any other taxes, customs duties, stamp duties, fees, assessments, or similar charges in the nature of a tax together with any interest, fines, and penalties imposed by any Governmental Authority, whether disputed or not.

9

"Transaction Documents" means this Agreement, the Union Entity Closing Items, and all other agreements, documents and instruments executed in connection herewith or required to be executed or delivered by the parties or any one or more of them in accordance with the provisions of this Agreement.

"Union Entities" means the Guilds and Pension Funds.

"Union Entity Assumption Agreement" means an assumption agreement, effective upon the Closing, in the standard form found in the collective bargaining agreement of each Union Entity applicable to each Covered Picture, which obligates FPLAC or MCP, as applicable, for all obligations thereunder that accrue after the Closing.

"Union Entity Closing Items" means the Guild Notes, the Guild Release, the Guild Payments, the Post-Closing Guild Liens and the Union Entity Assumption Agreements.

"WB" means Warner Brothers Pictures, Inc., including its predecessors, successors in interest, affiliates and related entities.

"WB Settlement Agreement" means that certain settlement agreement entered into on August 10, 2006 by and among the Debtors and WB as such agreement was approved by the Bankruptcy Court on August 23, 2006, and which has not been amended.

"WB-MCP Agreement" means that certain agreement entered into as of August 21, 2006 by and between MCP and WB.

Section 1.1.     Other Defined Terms. For purposes of this Agreement and any schedules hereto or other Transaction Documents, other capitalized terms used in this Agreement shall have the meanings ascribed to them elsewhere in this Agreement.

Section 1.2.     Other Meanings. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to," (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement, and (d) any reference to the singular shall include the plural.

## ARTICLE 2
PURCHASE AND SALE

Section 2.1.     FPLAC Purchase and Sale. Except as otherwise provided and subject to the terms and conditions set forth in this Agreement, each of the applicable Sellers agrees to sell, convey, assign, transfer and deliver to FPLAC, and FPLAC agrees to purchase from each of the applicable Sellers at the Closing (as defined in Article 8 hereof), all of each such Seller's right, title and interest in and to the FPLAC Purchased Assets, free and clear of all liens, pledges, mortgages, hypothecations and other encumbrances other than the Liens securing Assumed Liabilities of FPLAC with respect to the Guilds and WB.

Section 2.2.     MCP Purchase and Sale. Except as otherwise provided and subject to the terms and conditions set forth in this Agreement, each of the applicable Sellers agrees to sell,

10

convey, assign, transfer and deliver to MCP, and MCP agrees to purchase from each of the applicable Sellers at the Closing (as defined in Article 8 hereof), all of each such Seller's right, title and interest in and to the MCP Purchased Assets, free and clear of all liens, pledges, mortgages, hypothecations and other encumbrances other than the Liens securing Assumed Liabilities of MCP with respect to the Guilds and WB.

Section 2.3.    <u>Joint Bid for the Purchased Assets</u>.    Although FPLAC and MCP together are defined as the Purchaser, this Agreement does not constitute a partnership or agreement between FPLAC and MCP.    Except as provided in Section 10.7 hereof, the obligations of each of FPLAC and MCP hereunder and under the Transaction Documents are several, not joint, and run independently and only to the Sellers.

## ARTICLE 3
## DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES

Section 3.1.    <u>Purchased Assets</u>.    The assets, properties and rights to be conveyed to Purchaser (collectively, the "<u>Purchased Assets</u>") are:

(a)    with respect to the motion pictures (each, a "<u>Picture</u>," and, collectively, the "<u>Pictures</u>") identified on Schedules 3.2(a) and 3.2(b), including without limitation:

(i)    all rights of every kind and nature of any of the Debtors in and to any and all literary, musical, dramatic or other literary material upon which any Picture is or may be based, in whole or in part, or from which any Picture is or may be adapted or inspired or which may have been used or included in any Picture (including, without limitation, any and all drafts, versions and variations thereof);

(ii)    all copyrights and trademarks, rights in, under or related to copyrights or trademarks, interests in copyrights and trademarks and renewals and extension of copyrights and trademarks, domestic and foreign, heretofore or hereafter in, or obtained by, any of the Debtors in or in connection with any of the Pictures and the titles thereof and the rights (but not any obligation) to make any publication thereof for copyright, trademark and other purposes, to register claims under copyright and trademark, to renew and extend such registrations, and to sue in the name of any of the Debtors for past, present and future infringements of copyright or trademark or other rights;

(iii)    all rights of every kind and nature of any of the Debtors in or to any and all music and musical compositions created for, used in or to be used in connection with any of the Pictures including, without limitation, all copyrights therein and rights under or related to said copyrights and all rights to perform, copy, record, re-record, produce, publish, reproduce or synchronize any or all of said music

11

and musical compositions as well as other rights to exploit such music including phonorecord, soundtrack recording and music publishing rights;

(iv)    all rights of every kind and nature of any of the Debtors to produce, acquire, release, sell, distribute, sub distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize or otherwise exploit any of the Pictures and any and all rights therein (including, without limitation the rights referred to in subparagraph (vi) below) to the fullest extent of such rights, and if possible in perpetuity, without limitation, in any manner and in any media whatsoever, including without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining, subscription, sponsored and direct satellite broadcast), in theatres, non-theatrically, on cassettes, cartridges, CD, CD-I, CD-ROM and discs and other similar and dissimilar video devices, and by any and all other scientific, digital, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

(v)    all rights of every kind and nature, direct or indirect, of any of the Debtors to acquire, produce, develop, reacquire, finance, release, sell, distribute, sub-distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Pictures or any rights in or derived from any of the Pictures in any manner whatsoever now known or hereafter devised;

(vi)    all collateral, allied, ancillary, subsidiary, publishing, merchandising and licensing rights of every kind and nature, of any of the Debtors, derived from, appurtenant to or related to the Pictures including, without limitation, all production, exploitation, reissue, prequel, remake, sequel, serial or series, theme park and legitimate stage rights by use of film, tape, video or any other device now known or hereafter devised, whether based upon, derived from or inspired by any Picture or any part thereof; all rights to use, exploit and license others to use or exploit any and all novelization, publishing, video game, interactive, multimedia, commercial tie-up and merchandising rights of every kind and nature arising out of or connected with or inspired by any of the Pictures, the title of each Picture, the characters appearing in each Picture and/or the names or characteristics of said characters, and including further, without limitation, any and all commercial exploitation in connection with or related to the Pictures and the prequels, remakes of or sequels to any of the Pictures;

12

(vii)    all rights and benefits of every kind and nature, present and future, of any of the Debtors, in and to all chain of title documentation, all agreements to which any of the Debtors is a signatory or beneficiary in connection with which any Debtor has any rights relating to the development, production, completion, delivery and exploitation of any of the Pictures, all agreements for personal services including, but not limited to, the services of writers, members of the cast, directors, special effects personnel, animators, cameramen, and other creative, artistic and technical personnel and agreements for the use of studio space, equipment, facilities, locations, animation services, special effects services and laboratory contracts;

(viii)    all contract rights and general intangibles of every kind and nature of any of the Debtors in and in connection with any of the Pictures including, without limitation, those contract rights and general intangibles which grant to any person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, sub-distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit any of the Pictures or any rights in or derived from any of the Pictures including, without limitation, all such rights pursuant to agreements which relate to the ownership, production, financing or exploitation of any of the Pictures and all accounts, accounts receivable and contract rights arising thereunder and all proceeds thereof;

(ix)    all agreements of every kind and nature of any of the Debtors licensing, granting or selling any right to distribute, broadcast, exhibit or otherwise exploit any of the Pictures or any rights therein or derived therefrom including, without limitation, any and all rights relating to merchandising, licensing, publishing, music and phonorecords derived from or connected with any of the Pictures;

(x)    all physical properties of every kind and nature of any of the Debtors relating to any of the Pictures and all versions thereof including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of any of the Pictures, and all versions thereof or any part thereof, including exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals, intermediates, lavenders, fine grain master prints and matrices, and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements,

13

whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cut-outs, trims and any and all other physical properties of every kind and nature relating to any of the Pictures in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof, wherever located and all rights to ownership, possession, control or access thereof or thereto;

(xi)    all rent, revenues, income, compensation, accounts, products, increases, proceeds and profits or other property of every kind and nature of any of the Debtors, and any and all rights to receive the payment of money or other considerations, obtained or to be obtained from and after the Closing from the production, sale, distribution, sub-distribution, lease, sublease, marketing, licensing, sublicensing, exhibition, broadcast, transmission, reproduction, publication, ownership, exploitation or other uses or dispositions of any of the Pictures (or any rights therein or derived therefrom or part thereof) in any and all media and by any and all means now known or hereafter devised including, without limitation, the properties thereof and of any collateral, allied, ancillary and subsidiary rights therein and thereto, and any and all amounts recoverable as damages of any kind by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any other rights therein or derived therefrom in any manner whatsoever;

(xii)    any and all tangibles, equipment, chattel paper, inventory, documents of title, instruments, leases and goods of every kind and nature of any of the Debtors, not elsewhere included in this Section 3.1(a) which may arise or may exist in connection with the creation, production, completion, delivery, financing, ownership, possession or exploitation of any of the Pictures or any other asset described herein related to or derived from any of the Pictures;

(xiii)    the following personal property and the proceeds thereof: (a) all of the rights of the Debtors in and to the titles of the Pictures and all of each Debtor's rights to the exclusive use thereof including (without limitation) all rights protected pursuant to trademark, service mark, unfair competition or other laws, rules or principles of law or equity, and (b) all inventions, processes, formulae, licenses, patent applications, patents, patent rights, trademark applications, trademarks, trademark rights, service marks and corporate, company and trade name, logo and other business identifiers (for use in and in connection with the Pictures and the exploitation of any other rights acquired hereunder), and renewals and extensions thereof, domestic and foreign, and the rights (but not the obligation) to register, renew and extend trademarks and

14

service marks for use in and in connection with the Pictures and the exploitation of any other rights acquired hereunder and the rights (but not any obligation) to sue in the name any of the Debtors for past, present or future infringement of any of the foregoing; and

(xiv)   all income, proceeds and product derived from any of the foregoing;

(b)   all Assumed Contracts;

(c)   all rights available for transfer by Sellers from all Rejected Contracts, if any, together with any and all proceeds thereof but excluding the Excluded Assets;

(d)   all rights to collect monies and other consideration pertaining to the foregoing arising after the Closing, including any and all claims against Comerica Bank, Elie Samaha, Andrew Stevens, and any Affiliate or "insider" (as defined in Section 101(31) of the Bankruptcy Code) of the foregoing Persons, above except for the Settled Claims;

(e)   all rights to collect monies and other consideration, assert causes of action and/or claims for and obtain any and all forms of relief, assert audit rights or any other rights and/or remedies under, arising out of, or in connection with, any Assumed Contracts or any Contract on Schedule 3.4(b)(i), (ii) and (iii), as applicable, to the extent not otherwise needed by and available to the Sellers as an offset against any claims asserted against the Sellers' respective bankruptcy estates under the aforementioned Contracts; provided however that it is agreed by the Sellers such offset provision does not pertain to any contracts to which WB is a party.

(f)   any net refunds, rebates and/or credits for Taxes and all claims for each of the foregoing, applicable to the time-periods prior to and after the Closing, to the extent transferable and not otherwise needed by the Sellers as an offset against any Taxes assessed and otherwise payable as priority claims under Section 507(a)(8) of the Bankruptcy Code;

(g)   all unexploited and/or unproduced screenplays, treatments, book rights and other materials and all copyrights relating thereto;

(h)   the Excluded Assets (except insofar as any such assets would directly or indirectly include any right, title or interest as specified in Section 3.1(a)(i) - (xiv) with respect to any of the Pictures scheduled on Schedule 3.2(a)) but only to the extent that the Franchise Debtors or SPE Debtors, or assignee or representative thereof, or a Chapter 7 trustee, if applicable, have failed to administer their respective Excluded Assets within two (2) years after the confirmation of a plan of liquidation in the Bankruptcy Cases or within two (2) years of conversion to Chapter 7 of any or all of the Bankruptcy Cases.

(i)   all of the SPE Debtors' right, title and interest, if any, in any of the following entities: Nine Yards Two Distribution, Inc., Nine Yards Two Productions, Inc., TDP Distribution, Inc., TDP Productions, Inc., Reach Productions, Inc., and Sun Productions, Inc.

15

(j)     all of Sellers' right, title and interest, in the assets of Franchise Creative Corp.

Section 3.2.     Allocation of Assets.  The Purchased Assets shall be allocated between FPLAC (the "FPLAC Purchased Assets") and MCP (the "MCP Purchased Assets") as indicated on Schedule 3.2(a) and 3.2(b) hereto.

Section 3.3.     Excluded Assets.  All other assets, properties and rights of the Sellers, except the Purchased Assets, shall be retained by Sellers and shall not be sold, conveyed, assigned, transferred or delivered to Purchaser (collectively, the "Excluded Assets"). Notwithstanding anything to the contrary in Section 3.1 (except as provided for in Section 3.1(h), (i) and (j) above), the Purchased Assets shall not include any of the following assets, properties and/or rights of Sellers, all of which are included in the Excluded Assets:

(a)     all cash on hand or deposited in financial institutions, cash equivalents, marketable securities or bonds and any cash actually received by the Sellers from and after the date upon which this Agreement is executed through and including the Closing on account of any of the Purchased Assets;

(b)     all of Sellers' right, title and interest, if any, in any non-Debtor entity;

(c)     all of Sellers' non-contingent, liquidated rights to receive payments under the WB Settlement Agreement which are due and payable from WB on or before the Closing Date pursuant to sections 3 and 4 of the WB Settlement Agreement;

(d)     except to the extent included in Assumed Contract Rights, all claims, rights of offset or causes of action against third parties arising under and relating to Chapter 5 of the Bankruptcy Code, other than the Settled Claims and Assumed Contract Rights;

(e)     all of the Preserved Claims or proceeds therefrom;

(f)     all Excluded Contracts;

(g)     all personnel records and other records that Sellers are required by law to retain in their possession and any retained copies of any record or document included in the Purchased Assets; and

(h)     all insurance proceeds, claims and/or causes of action solely with respect to or arising in connection with (i) any rights relating to any Rejected Contract that cannot be transferred to Purchaser hereunder, (ii) any Excluded Contract, or (iii) any item of tangible or intangible property not acquired by Purchaser at the Closing.

Section 3.4.     Assumed Liabilities; Non-Assumed Liabilities.

(a)     Purchaser acknowledges and agrees that at the Closing, Purchaser shall acquire the Purchased Assets subject to (i) the Pre-Existing Guild Liens applicable to the FPLAC Pictures and the MCP Pictures, if any, respectively; (ii) the Post-Closing Guild Liens applicable to the FPLAC Pictures and the MCP Pictures, if any, respectively; and (iii) the applicable Post-

16